Thomas PUGH, Jr., and Clay Chatin, Plaintiffs,

v.

Glenn S. GOORD, Commissioner of the New York State Department of Correctional Services; Warith Deen Umar, Former Ministerial Program Coordinator for Islamic Affairs; Mark Leonard, Director of Ministerial and Family Services; John R. LoConte, Former Director of Ministerial and Family Services; Frank Headley, Former Deputy Commissioner for Program Services; John Nuttal, Deputy Commissioner for Program Services and Former Assistant Commissioner for Program Services; William Mazzuca, Superintendent of Fishkill Correctional Facility; Ada Perez, Former Deputy Superintendent for Program Services at Fishkill Correctional Facility; and Jimmie Harris, Deputy Superintendent for Program Services at Fishkill Correctional Facility and Former Director of Ministerial and Family Services; Defendants.

No. 00 Civ. 7279(RJS).

United States District Court, S.D. New York.

July 31, 2008.

Aaron O. Lavine, Esq., and Amy E. Howlett, Esq., Sullivan & Cromwell, LLP, New York, NY, for Plaintiffs.

Mark T. Walsh, Esq., Gleason, Dunn, Walsh & O'Shea, Albany, NY, for Defendant, John R. LoConte.

Warith Deen Umar, Defendant, pro se.

Leonard A. Cohen, Esq. and Michael J. Keane, Esq., Office of the Attorney General of the State of New York, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Thomas Pugh, Jr., and Clay Chatin, each currently or previously incarcerated by the New York State Department of Correctional Services ("DOCS"), bring this action against defendants Glenn S. Goord, Warith Deen Umar, Mark Leonard, John LoConte, Frank Headley, John Nuttal, William Mazzuca, Ada Perez, and Jimmie Harris (collectively "Defendants")[1] alleging under 42 U.S.C. § 1983 violations of their constitutional and statutory rights to free exercise of Shi'a Islam[2] and to be

---

1. Original defendant Ismail Abdur Rahim is now deceased. In addition, plaintiffs have stipulated to the dismissal of defendant Muhammad Salih Ahmed from the action. (*See* Pls.' Opp'n at 3 n. 5.)

2. Although there are many different spellings of the terms "Shi'ite" and "Shi'a," as well as different usages, the Court has adopted these spellings for clarity's sake. The Court will generally use "Shi'ite" where a noun or ad-

free from the establishment of the Sunni branch of Islam under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, and the First and Fourteenth Amendments to the Constitution of the United States. Specifically, plaintiffs claim that the failure of DOCS to mandate separate Friday prayer services (known as "Jumah" services) for Shi'ite inmates, independent of Sunni participation, violates their constitutional and statutory rights. Plaintiffs seek declaratory and injunctive relief, compensatory, nominal, and punitive damages, and an award of attorneys' fees and costs.

Before the Court are two motions for summary judgment on all claims—one by defendant John LoConte, and another by defendants Goord, Leonard, Headley, Nuttal, Mazzuca, Perez, and Harris (collectively "State Defendants").[3] Defendant Warith Deen Umar is proceeding *pro se* in this case and has not moved for summary judgment nor joined in either of the motions.

For the reasons that follow, both motions are granted in part and denied in part. Specifically, defendants' motion to dismiss plaintiff Chatin's claims for injunctive relief on the basis of mootness is granted. In addition, summary judgment in favor of all defendants is granted on plaintiffs' RLUIPA claims to the extent plaintiffs seek to recover monetary damages on that claim. In all other respects, defendants' motions for summary judgment are denied.

## I. BACKGROUND

### A. The Facts

The following is a recitation of those facts relevant to the resolution of the summary judgment motions. The Court shall view these facts in the light most favorable to plaintiffs, as it must on a motion for summary judgment. *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir.2004).

### 1. The Plaintiffs

Plaintiff Pugh is an inmate currently in the custody of DOCS and housed at Adirondack Correctional Facility. (*See* Defs.' 56.1 ¶ 2; Keane Decl. ¶ 2, Ex. B.)[4] Pugh formerly resided at both Mid–Orange Correctional Facility in Orange County, New York ("Mid–Orange") and Fishkill Correctional Facility in Dutchess County, New York ("Fishkill"). (*See* Second Am. Compl. ¶ 5.) Plaintiff Chatin is a former inmate of DOCS, having been released on or about October 18, 2007. (*See* Keane Decl. ¶ 1, Ex. A.) Prior to his release, Chatin was housed at both Mid–Orange and Fishkill. (*See* Second Am. Compl. ¶ 6.) Original plaintiff Errol Ennis was deported, did not sign the Second Amended Complaint, and was terminated from this action on January 20, 2004. (*See* State Defs.' 56.1 ¶ 2, Ex. L.) Original plaintiff Edward Hamil stipulated to the withdrawal of all of his claims from the lawsuit in 2005. (*See id.* ¶ 2, Ex. N.)

Plaintiffs identify themselves as adherents of the Shi'a sect of Islam. (Pugh Decl. ¶ 1; Chatin Decl. ¶ 1.) Plaintiffs assert that they have brought this action "to vindicate their constitutional and statutory right to the free and equal exercise of the Shi'ite Muslim religion, and to be free from the establishment of the Sunni Muslim religion, in prisons operated by

---

jective is called for, and "Shi'a" as a descriptive term for the Shi'a faith or religion.

3. Where the arguments of all defendants are convergent, the Court shall refer to all moving defendants simply as "defendants."

4. Where only one party's 56.1 Statement is cited, the facts are taken from that party's 56.1 Statement, and the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

[DOCS]." (Second Am. Compl. ¶ 1.) According to plaintiffs, there are important differences between the Shi'a faith and the Sunni faith, which require that Shi'ites be given separate accommodations, including their own prayer services. (*See, e.g.,* Pugh Decl. ¶¶ 2, 5–7, 23, 26; Chatin Decl. ¶¶ 10–12, 15–18, 22–23.) Plaintiffs assert that, as Shi'ites, they are required to participate in a weekly communal prayer service, called the "Jumah" service, which must be led by a Shi'ite imam, or prayer leader. (*See* Pugh Decl. ¶¶ 11, 16, 18–21, 23–24; Chatin Decl. ¶¶ 2–5, 8–11, 18–19.)

### 2. The Protocol

Current DOCS policy on the accommodation of Shi'ites is governed by the "Protocol for Shi'ite Muslim Programs and Practices" (the "Protocol"). (*See* State Defs.' 56.1 ¶ 43 & Ex. C at Ex. 4 (the Protocol, dated October 26, 2001).) The Protocol was implemented in 2001 in response to concerns raised by Shi'ite inmates, including plaintiffs, concerning the treatment and accommodation of Shi'ites by DOCS, as well as the decisions in *Cancel v. Goord,* 181 Misc.2d 363, 365–66, 695 N.Y.S.2d 267 (Sup.Ct. Dutchess Cty.1999) and *Cancel v. Goord,* 278 A.D.2d 321, 323, 717 N.Y.S.2d 610 (2d Dep't 2000).[5] (*See* State Defs.' 56.1 ¶¶ 36–37; Pls.' 56.1 Opp'n ¶ 37.) State Defendants assert that the Protocol "was developed through at least

two years of review and consultation with major Islamic organizations in New York, including [the Al–Khoei Center for Islamic Studies] in the Spring and Summer of 2001." (State Defs.' 56.1 ¶ 49.) According to State Defendants, the purpose of meeting with representatives of the Al–Khoei Center, a Shi'ite mosque and educational center, was to develop a policy that would adequately accommodate Shi'ite inmates. (*See* State Defs.' 56.1 ¶ 38–41.) Following these consultations, DOCS adopted the Protocol and disseminated it to all DOCS facilities. (*Id.* at 43–44.) State Defendants contend that Al–Khoei supported the Protocol, and agreed with the conclusion that Shi'ites and Sunnis could pray together at Jumah services.[6] (*Id.* at 50–52.)

The Protocol first provides that "all Department employees, including Chaplains, and volunteer Chaplains, and all inmate facilitators, shall absolutely refrain from disparaging in any manner whatsoever, the doctrines, beliefs or teachings of any other religious faith, nor disparage any inmate or group of inmates for being adherents of any other religious faith, or sect." (Protocol, Article I.) Next, the Protocol instructs that DOCS will consult with "ecclesiastical authorities on Shi'ite Islam in the community-at-large" to obtain guidance and recommendations on the appropriate "texts, literature, [and] educational materials" for Shi'ite inmates, as well as recommenda-

---

**5.** In *Cancel,* 278 A.D.2d at 322, 717 N.Y.S.2d 610, the Second Department directed that DOCS "conduct administrative proceedings, with Shi'ite participation, to determine the manner in which to best afford Shi'a inmates separate religious services, under appropriate Shi'a religious leadership, in a time and place that comport with legitimate penalogical [*sic*] concerns." (*See also* Pls.' 56.1 Opp'n ¶ 37.)

**6.** Plaintiffs contest State Defendants' assertions that Al–Khoei approved DOCS policies regarding congregate Jumah services. According to plaintiffs, the only purpose of the Al–Khoei meetings with DOCS was to "assure

[Al–Khoei] of the department's compliance with the court's ruling [in *Cancel*]." (Pls.' 56.1 Opp'n ¶ 40.) Plaintiffs assert that "once Al–Khoei realized that DOCS intended to maintain a one-Jum'ah policy permanently, it withdrew all support for the Shi'ite Muslim Protocol." (*Id.* ¶ 38.) To this end, plaintiffs point out that "Muhsin Alidina of the Al–Khoei Center testified that once the Center realized that DOCS did not intend to offer separate Shi'ite services, the Center disassociated itself with the Protocol to avoid being part of something they had not agreed upon." (*Id.*)

tions for Shi'ite volunteer and employee Chaplains. (*Id.* at Article II.) The Protocol further provides that "Shi'ite Muslim inmates shall have the same rights as all other inmate faith groups to attend Shi'a Muslim religious education and study classes" as well as "the full and equal opportunity to participate in, without discrimination, the weekly Friday Jumah service for all Muslim inmates of a particular correctional facility." (*Id.* at Articles III, IV.) In addition, "Shi'ite Muslim Chaplains, whether they be employees or outside volunteers, shall be entitled to officiate at the weekly Jumah services in the same manner as any other Muslim chaplain or outside volunteer Chaplains." (*Id.* at Article IV.) Finally, under the Protocol, "[t]he Department shall revise its Religious Observance Calendar in consultation with its outside ecclesiastical authorities as referenced in Article II hereinabove, to include observances unique to Shi'ite Muslims, namely the observances of Ashura and the Id–ul–Ghadeer Khum." (*Id.* at Article V.)

State Defendants assert that, under the Protocol, Shi'ite inmates are given the option of attending congregate Jumah services on Fridays. (*See* State Defs.' 56.1 ¶ 13.) State Defendants also assert that DOCS provides classes and dietary accommodations for Shi'ites, as well as a Shi'ite chaplain who ministers to Shi'ite inmates. (*Id.* ¶¶ 16, 21.) They also contend that DOCS accommodates observances of religious holidays pursuant to the Protocol. (*Id.* ¶ 16.) State Defendants admit that

Shi'ite Muslim inmates do not have their own separate Jumah service conducted by a Shi'ite cleric, but contend that plaintiff Pugh has conceded that Shi'ites can satisfy the Friday prayer obligations by praying the Zohr prayer alone in their cells. (*Id.* ¶ 111.)

3. Plaintiffs' Opposition to the Protocol

Plaintiffs object to the Protocol first because they contend that it does not go far enough in addressing their needs. Plaintiffs believe that as practicing Shi'ites, they are required to participate in a Friday Jumah prayer service led by a Shi'ite. (*See* Pls.' 56.1 ¶¶ 6, 9, 12–14; Pugh Decl. ¶¶ 11, 16, 18–21, 23–24; Chatin Decl. ¶¶ 2–5, 8–11, 18–19.) They also believe that the Jumah service must be separate from a service that includes Sunni Muslims (*see* Pls.' 56.1 ¶¶ 2, 9), and that a Sunni-led service does not have religious value to them, nor satisfy their religious requirements (*id.* ¶¶ 3–5, 9, 15). Likewise, they assert that the Zohr prayer is not an adequate permanent substitute for attending Shi'ite-led Jumah services on a long-term basis. (*See id.* ¶ 111; Pugh Decl. ¶ 14; Chatin Decl. ¶ 6–8.)[7]

In that vein, plaintiffs also assert that, despite the implementation of the Protocol, they have been subjected to disparate treatment and experienced anti-Shi'ite discrimination and hostility as a result of DOCS policies and the actions and inactions of DOCS employees. For example, plaintiffs state that many prison libraries contain anti-Shi'ite books and other propaganda; that, at certain facilities, Shi'ites

**7.** Plaintiffs also present evidence that, in any event, the Protocol is not being fully and properly implemented. For example, Chatin asserts that, at Fishkill, Shi'ite inmates "were never given the opportunity to celebrate either Ashura or Id'l ghadeer Khum," contrary to the Protocol's directives, and that, at Mid–Orange, Shi'ites have never been allowed to celebrate Id'l ghadeer Khum. (Chatin Decl.

¶¶ 63–69.) Chatin also asserts that, despite the fact that the Protocol directs that the Muslim Majils, or councils, in each facility shall have at least one Shi'ite member (if there is a Shi'ite in the general population), Shi'ites were never members of the Majils or allowed to lead prayers at either Fishkill or Mid–Orange. (*Id.* ¶ 72.)

are denied means to break the Ramadan fast if they do not attend the Sunni Jumah; and that Shi'ites often cannot obtain books for Shi'ite programs or storage for books, even though storage is available. (*See* Pugh Decl. ¶¶ 40–42; Chatin Decl. ¶¶ 43–44, 46, 53–54.) They also contend that they have personally experienced discrimination and hostility from Sunni inmates and leaders, including defendant Umar, which defendants have failed to remedy. (*See, e.g.,* Pugh Decl. ¶¶ 27–39, 43; Chatin Decl. ¶¶ 28–34, 45–49.)

Plaintiffs thus contend that "DOCS' accommodation of Shi'ite Muslims is insufficient and is in essence a Sunni Muslim program, not a generic program." (Pls.' 56.1 Opp'n ¶ 13; *see also* Pugh Decl. ¶¶ 23–24; Chatin Decl. ¶¶ 51.)

### B. Procedural History

Plaintiffs commenced this action on September 27, 2000. On August 27, 2001, in response to the implementation of the Protocol, Pugh filed a motion for a preliminary injunction seeking "to afford plaintiffs and other Shi'ite Muslims in the same situation a separate prayer area free from Sunni influence in a time or place that comport[s] with legitimate penological concerns." (State Defs.' 56.1 ¶ 54.) On October 5, 2001, the Court held a conference at which the parties were instructed to address whether the Protocol had mooted plaintiffs' claims at issue in the case. (*See* August 21, 2001 Order.) Pugh informed the Court that, notwithstanding the Protocol, plaintiffs required separate religious services, including a separate prayer area. (State Defs.' 56.1 ¶ 56.) Both plaintiffs stated, either on the record or in affidavits, that they required a separate Shi'ite chaplain to lead the prayer services. (*Id.* ¶¶ 56–57.)

On January 3, 2002, the Honorable Gerald E. Lynch, District Judge, to whom this case was previously assigned, denied the plaintiffs' request for a preliminary injunction and dismissed the case *sua sponte,* finding that the joint services policy did not violate the First Amendment. *See Pugh v. Goord,* 184 F.Supp.2d 326, 337 (S.D.N.Y.2002). On September 24, 2003, the Second Circuit reversed, finding that a *sua sponte* dismissal was not appropriate. *See Pugh v. Goord,* 345 F.3d 121, 124–26 (2d Cir.2003).

The plaintiffs then filed a Second Amended Complaint, and the parties proceeded to discovery. On September 3, 2004, the case was reassigned to the Honorable Kenneth M. Karas, District Judge, and discovery closed on or about September 30, 2005. On April 6, 2006, defendants filed the instant summary judgment motions.

On September 4, 2007, this case was reassigned to the undersigned. On September 28, 2007, the Second Circuit issued an unpublished summary order reversing the district court's grant of summary judgment in a similar case, *Orafan v. Rashid,* pending in the Northern District of New York. *See Orafan v. Rashid,* 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). In that order, the court stated that reversal was appropriate because the record reflected "unresolved issues of material fact relevant to the questions of (1) the burden that the denial of a Friday congregate prayer service placed on plaintiffs' religious exercise; and (2) whether the DOC is able to accommodate plaintiffs' request for a [Shi'ite]-led Friday congregate prayer service without jeopardizing legitimate penological objectives." *Id.* at 218.

In a letter dated October 1, 2007, plaintiffs wrote to the Court, apprising the Court of the *Orafan* decision and requesting that the Court deny the outstanding summary judgment motions based on *Orafan.* Defendant LoConte and State Defen-

dants responded to plaintiffs' letter with their own letters, dated October 5, 2007 and October 9, 2007, respectively, asserting that the summary judgment motions were still viable and should be granted. On October 29, 2007, the Court held a conference to address the impact of *Orafan* on the pending motions. After that conference, the parties filed supplemental briefs with the Court, and the Court held oral argument on the motions on February 13, 2008.

## II. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Bronx Household of Faith v. Bd. of Educ. of City of New York,* 492 F.3d 89, 96 (2d Cir.2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am.,* 361 F.3d at 122; *see also Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *Rivkin v. Century 21 Teran Realty LLC,* 494 F.3d 99, 103 (2d Cir.2007). As such, "if 'there is any evidence in the record from any source from which a reasonable infer-

ence in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original).

## III. DISCUSSION

### A. Mootness

#### 1. Pugh

State Defendants assert that because Pugh has been transferred to the Adirondack Correctional Facility ("Adirondack") and is no longer a prisoner at Fishkill, his claims for injunctive relief are moot. (*See* State Defs.' Supp. Mem. at 8–9.) Pugh argues that his claims are not moot, because he "possesses a very real and legally cognizable interest in the outcome of this case" as he continues to be denied a separate Shi'ite Jumah service at Adirondack. (*See* Letter dated Nov. 16, 2007 from Aaron O. Lavine and Amy E. Hewlett to the Court ("Pls.' Supp. Mem.") at 2.)

■■■ Generally, it is true that a prisoner's transfer from a prison facility moots that prisoner's claim for injunctive relief against the transferring facility. *See Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996). However, there is an exception to the mootness doctrine for challenged actions that are "capable of repetition, yet evading review." *See Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). This exception will be applied—provided the action is not a class-action lawsuit—if " '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party would be subjected to the same action again.' " *Id.* (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)); *Muhammad v. City*

*of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997).

■ The Court finds that Pugh's action qualifies for the "capable of repetition, yet evading review" exception, and that Pugh's transfer does not moot his action for injunctive relief. First, the Court finds that the duration element is satisfied, due to DOCS' ability to freely transfer Pugh between facilities prior to full litigation of his claims. To find otherwise would mean that prison officials could simply transfer a prisoner from facility to facility in order to moot his claims, even where the same conditions that underlie the plaintiff's litigation are present at the new facility. Second, the Court finds that there is "a reasonable expectation that the same complaining party [will] be subject to the same action again." *Murphy,* 455 U.S. at 482, 102 S.Ct. 1181; *see also Washington v. Harper,* 494 U.S. 210, 219, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding that prisoner's claims were not moot despite prisoner's transfer to a non-offending facility, given that the "[t]he alleged injury would likely recur"). Pugh still maintains "a legally cognizable interest," *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), in the outcome of this action given that he is still a prisoner at a DOCS facility. DOCS' policies, particularly the Protocol, are applicable to all prison facilities, and no separate Shi'ite Jumah services appear to be currently available at Adirondack Correctional Facility, where Pugh is housed. (*See* Pls.' Supp. Mem. at 2; Keane Decl. ¶ 4 ("Adirondack does not have the physical space at this time to accommodate an additional Jumah service.").) Additionally, there is some evidence that plaintiff has made similar requests for Shi'ite services to officials at Adirondack, though State Defendants dispute this assertion. (*See* Lavine Decl. ¶ 7

(noting that, on information and belief, Pugh has requested Shi'ite Jumah services at Adirondack); Keane Decl. ¶ 3 ("[O]fficials at Adirondack ... have not fielded any requests by any Muslim inmate to have Jumah services separate from the unitary services now provided for by DOCS.").)

Accordingly, the Court finds that Pugh's claims for injunctive relief are not moot.

### 2. Chatin

State Defendants also contend that plaintiff Chatin's claims for injunctive relief are moot, given that he was released from DOCS custody in October 2007. (*See* State Defs.' Supp. Mem. at 7–8.) Chatin asserts in opposition that his claims are not moot because he "intends to serve as an external facilitator for Shi'ite Jumah services in DOCS, where he would visit, join in, and perhaps lead Friday Jumah services." (Pls.' Supp. Mem. at 3.) Chatin also contends that the conduct challenged by his claims for injunctive relief is capable of repetition, yet evading review, because "given the unfortunately high rates of recidivism in America, it is all too likely that Mr. Chatin will find himself in prison once again ..." (*See id.* at 4.)

■ Where a prisoner has been *released* from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot. *See Hallett v. New York State Dep't of Corr. Serv.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000) (citing *Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at *3 (S.D.N.Y. Nov.17, 1997)); *see also Rhodes v. Stewart,* 488 U.S. 1, 4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) (holding that a lawsuit brought by two prisoners to modify prison policies on magazine subscriptions, where not a class action lawsuit, was moot where one prisoner had been released and the other had died by the time the district court entered an order).

■ The Court finds that, given that plaintiff Chatin was released from prison on October 18, 2007 (*see* Keane Decl. ¶ 1, Ex. A), Chatin's claims for injunctive and/or declaratory relief against DOCS are moot. First, the Court rejects Chatin's argument that his participation as an "external facilitator" for Shi'ite Jumah services in DOCS, even if permitted, allows Chatin to continue to assert claims for injunctive relief. There is no guarantee that Chatin will be permitted to be a "facilitator" for Shi'ites in DOCS custody. Even if he were permitted to do so, Chatin has not shown how such activity would constitute a legally-cognizable interest in the instant litigation. Chatin's claims arise out of DOCS' refusal to provide him with a separate Shi'ite Jumah service. Given that Chatin is no longer a prisoner, and thus free to worship in any manner available to him going forward, he has no remaining interest in the litigation.

Chatin's second argument—that he will likely end up in prison again, thus preserving his claim in the event of future incarceration—is meritless, speculative, and, on some level, highly insulting. *See Muhammad*, 126 F.3d at 124 (rejecting plaintiff's claim that his case was capable of repetition yet evading review where "he has stated no basis for an expectation that he will again find himself in the custody of the DOC and subject to its policies"). Accordingly, Chatin's claims for injunctive relief are denied as moot. This holding does not implicate Chatin's claims for monetary damages, which are addressed below.

## B. Exhaustion

Defendants next move for summary judgment on the ground that plaintiffs failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). (*See* State Defs.' Mem. at 20–25; LoConte Mem. at 50.) Plaintiffs respond that their claims were properly exhausted pursuant to the PLRA. (*See* Pls.' Opp'n at 22–28.) For the reasons that follow, the Court finds that plaintiffs properly exhausted their administrative remedies and summary judgment on this ground is denied.

### 1. Legal Standard

■ The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It is well-settled that this requirement "applies to all inmate suits about prison life, whether they involved general circumstances or particular episodes, and whether they alleged excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). A grievance that is procedurally defective does not satisfy the exhaustion requirement, regardless of the notice given to prison officials about the claim. *See Woodford v. Ngo*, 548 U.S. 81, 83–84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

"Complete exhaustion to the highest level is required for each claim." *Singh v. Goord*, 520 F.Supp.2d 487, 495 (S.D.N.Y. 2007) (citing *Veloz v. New York*, 339 F.Supp.2d 505, 514 (S.D.N.Y.2004)). "Moreover, a claim must be completely exhausted prior to commencing suit. It is insufficient to take only limited steps towards exhaustion before commencing the suit, or even to exhaust a claim entirely during the pendency of the case." *Schwartz v. Dennison*, 518 F.Supp.2d 560, 568 (S.D.N.Y.2007) (citing *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir.2001)).

It is undisputed that DOCS has established an Inmate Grievance Program ("IGP"), the purpose of which is to provide

inmates with an "orderly, fair, simple and expeditious method of resolving grievances ..." in accordance with the PLRA's exhaustion requirement. 7 N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1(a) (2008); (Pls.' Opp'n at 23); *see also Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Therefore, the only issue before the Court is whether plaintiffs exhausted their administrative remedies via the IGP.

### 2. Analysis

It is undisputed that Pugh filed a grievance on December 26, 1999. (*See* Defs.' Mem. at 22; Pugh Decl. Ex. G at D0846.) In that grievance, Pugh described his complaint as concerning "the discrimination of the Shi'ite community in this facility ... when there are differences in religious understanding, and that the Sunni religious coordinator nor their teachers can give grievant adequate religious understand[ing]." (Pugh Decl. Ex. G at D0846.) Pugh requested that the "administration take appropriate steps to accommodate grievant with the appropriate religious coordinator, and outside visitors pursuant to directive # 4750 as other religious groups, i.e., Sunni, [Nation of Islam], Moorish, etc., and any further relief deem[ed] proper in this circumstance." (*Id.*)

The evidence in the record also demonstrates that Chatin filed a grievance on December 22, 1999. (*See* Chatin Decl. Ex. B at D0844.) In that grievance, Chatin described his complaint as follows: "Grievant who is a Shi'a [M]uslim is complaining that he is being discriminated against by this facility by depriving him his rights to religious freedom granted by the 1st Amend[ment]. This fac[ility] is gone so far as to discriminate against grievant that they deprive the grievant the rights to meet with volunteers of the grievant's beliefs in accordance with directive # 4750." (*Id.*) Chatin requested that "this discrimi-

nation stop and the facility stop denying the grievant his right to meet and receive spiritual guidance from a cleric of his belief in accordance with directive # 4750" (*Id.*)

Finally, former plaintiff Ennis also filed a grievance on December 22, 1999. (*See* Pugh Decl. Ex. G at D0851.) In that grievance, Ennis wrote that he was also a Shi'ite Muslim being deprived of his right to meet with a volunteer who could provide spiritual counseling in accordance with directive # 4750. (*Id.*) Ennis also wrote that "this grievant ha[s] no place of worshiping and practice my belief. Fishkill provide others with a chapl[a]in and a place to worship and study. The Sunnies [*sic*] have a place of worshiping also does the Nation of Islam ... our teaching do not go together we need a place to worship and do our studies." (*Id.* at D0851, D0845.) Ennis's grievance was labeled with the number 19483–99. (*Id.*)

Pugh and Chatin were informed by letters of March 6 and March 17, 2000, respectively, that their grievances had been consolidated with Ennis's grievance, under the number 19483–99. (*Id.* at PUGH 0031–32; *see also* Pls.' 56.1 Opp'n ¶¶ 9–11.) On January 7, 2000, the Superintendent rendered a decision on the consolidated grievance, stating that "[t]he Sh'ia Muslim *inmates* have been told by Imam Muhammad that until we get clarification from Counsel's Office in Albany regarding a court case pending, the Sh'ia Muslims are to be afforded the same type service as all Islamic inmates." (Pugh Decl. Ex. G at D0841 (emphasis added).) That decision listed "E. Ennis" as the grievant, but indicates that the decision was copied to "T. Pugh" and "C. Chatin." (*Id.*) Ennis then appealed the decision on January 11, 2000, stating "there is a major difference between Sunnis and Shi'as ... we need clergy of our faith to counsel us!" (*Id.*)

On February 2, 2000, DOCS' Central Office Review Committee ("CORC") issued a decision upholding the determination of the Superintendent, noting that "the Sh'ia Muslims are receiving appropriate religious accommodations ..." (Pugh Decl. Ex. G at D0840.) The decision specifically quoted the complaints contained in the consolidated grievance. (*Id.*) After the decision was issued, Chatin also wrote a letter to CORC on behalf of himself, Pugh, and Ennis requesting an "appeal" of that decision on the grounds that CORC should have conducted an investigation rather than relying on the investigation of defendant Ada Perez, the former Deputy Superintendent for Program Services at Fishkill. (*See* Chatin Decl. ¶ 39 & Ex. D.)

Defendants do not contest that the grievances were consolidated and fully exhausted by appeal to the CORC. Instead, they assert that plaintiffs Pugh and Chatin did not themselves file grievances specifically complaining about separate Jumah services for Shi'ite inmates, or any other grievances encompassed in the lawsuit. (State Defs.' Mem. at 22–24.) They further argue that "[p]laintiffs should not be permitted to piggyback on another inmate's grievance, which, generally related by catch-all theme—'worship'—is not specifically related to relief they sought" (State Defs.' Reply Mem. at 5), and that the decision by CORC on the consolidated grievance "was not responsive to plaintiffs' grievances" (*id.*).

■ The Court finds that the undisputed facts demonstrate that the plaintiffs properly and fully exhausted their administrative remedies prior to filing this lawsuit. First, it is clear that the 1999 grievances of Pugh, Chatin, and Ennis were consolidated into one grievance, pursuant to § 701.7(2), which permits the consolidation of "like grievances" at the discretion of certain IGP officials. *See* 7 N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7(2) (2008); *see also Labounty v. Johnson,* 253 F.Supp.2d 496, 503 (W.D.N.Y.2003). The Court thus rejects State Defendants' contention that the DOCS response to Ennis's grievance was merely "forwarded" to Pugh and Chain. (State Defs.' Reply at 5.) Rather, the Court finds that the decisions of the Superintendent and CORC encompassed all three grievances, and considered them "like" grievances addressing related issues. This is evident based on the notice of consolidation sent to Pugh and Chatin (*see* Pugh Decl. Ex. G at PUGH 0031–32), the fact that the cases were consolidated under the same grievance number 19483–99 (*id.*), and the reference in the Superintendent's decision to the claims of "Sh'ia Muslim *inmates.*" (*Id.* at D0841 (emphasis added).) There is also no question that the consolidated grievance was fully exhausted, as the CORC issued a final decision on the grievance. (*See* Pugh Decl. Ex. F at 0840.) As such, the Court finds that the 1999 grievances of Pugh and Chatin were fully exhausted in accordance with the PLRA.

Second, it is clear from the face of the Superintendent's and CORC's decisions that the subject matter of the consolidated grievance was the same as the subject matter of this litigation—namely, that Shi'ites are entitled to certain rights given to other Muslims in DOCS custody (separate services and counseling). The Superintendent noted that, pending further instruction from counsel, "the Sh'ia Muslims are to be afforded *the same type service* as all Islamic inmates." (Pugh Decl. Ex. G at D0841 (emphasis added).) Likewise, the decision from the CORC noted that "the Sh'ia Muslims are receiving appropriate religious accommodations ..." (*Id.* at D0840.) Thus, it is clear that the issues raised in the consolidated grievance are the same issues raised by plaintiffs in the

instant action, specifically plaintiffs' request for separate Jumah services, and access to a Shi'ite spiritual counselor.

■ The PLRA requires "proper exhaustion," or "that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford*, 548 U.S. at 88, 126 S.Ct. 2378. Defendants have not pointed to any part of the administrative review process that was not completed by plaintiffs via the consolidated grievance. Moreover, proper exhaustion fulfills the goals of the PLRA because it "gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors." *Id.* at 94, 126 S.Ct. 2378. It is clear from the record that the consolidated grievance complied with IGP procedures, and gave prison officials a "fair opportunity" to consider plaintiffs' complaints, including the request for a separate Shi'ite chaplain and worship separate from Sunnis, in the manner afforded to other Muslim sects. *Id.; see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.2004) ("In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.")

Those complaints remain the subject of this litigation.

Finally, State Defendants also assert that plaintiffs' claims against the individual defendants must be dismissed because plaintiffs failed to mention any allegedly unlawful conduct by the individual defendants in their grievances. (*See* State Defs.' Reply Mem. at 4 & n. 3.) However, the Supreme Court has squarely held that an inmate is not required to name in a grievance each defendant he later wishes to sue in order to fully exhaust his claims. *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910, 922, 166 L.Ed.2d 798 (2007).

Accordingly, defendants' motions for summary judgment on the grounds that the plaintiffs did not properly exhaust administrative remedies are denied.[8]

### C. The Establishment Clause

State Defendants next assert that summary judgment is appropriate against plaintiffs' claims that defendants have established Sunni Islam as the official Islamic religion of DOCS because the record is devoid of any evidence to demonstrate such an establishment. (State Defs.' Mem. at 40–41.) Plaintiffs respond that they have proffered evidence sufficient to demonstrate that DOCS' religious programs advance, for non-secular purposes, one interpretation of Islam over another. (Pls.' Opp'n at 71.) For the reasons that follow, defendants' motion for summary judgment on the Establishment Clause claim is denied.[9]

---

**8.** Because the Court finds that plaintiffs exhausted their claims via the IGP process, the Court need not reach the question of whether the grievances filed by plaintiffs subsequent to the commencement of this action, but before the filing of the Second Amended Complaint, satisfy the exhaustion requirement. (*See* State Defs.' Mem. at 24–25; Pls.' Opp'n at 25–28; State Defs.' Reply at 3–5.)

**9.** Defendant LoConte asserts that "[t]he issues with respect to the plaintiffs' Establishment Clause and Equal Protection claims are un-

derstood to be directed against DOCS Commissioner Goord" (LoConte Mem. at 43), and notes that he is not mentioned in plaintiff's arguments relating to the Establishment Clause (LoConte Reply Mem. at 9). LoConte further contends that "[t]o the extent that [the Establishment Clause and Equal Protection Clause claims] are addressed to Mr. LoConte, he asserts that plaintiffs cannot prove those claims, that he had no personal involvement, that plaintiffs have not identified the allegedly similarly suited group, that he had no animus,

### 1. Legal Standard

▮▮▮ "The Establishment Clause forbids 'excessive government entanglement with religion.'" *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir.2008) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). The test articulated in *Lemon v. Kurtzman* has never been overruled and continues to govern the analysis of Establishment Clause claims in the Second Circuit. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 355 (2d Cir.2007) ("In determining whether a particular law violates the Establishment Clause . . . we examine the government conduct at issue under the three-prong analysis articulated by the Supreme Court in [*Lemon* ]."); *see also Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 634 (2d Cir.2005). "Under *Lemon*, government action that interacts with religion must: (1) have a secular purpose, (2) have a principal effect that neither advances nor inhibits religion, and (3) not bring about an excessive government entanglement with religion." *Westchester Day Sch.*, 504 F.3d at 355 (citing *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105). Of particular relevance in this case is the principle "at the heart of the Establishment Clause" that "government should not prefer one religion to another, or religion to irreligion." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

▮▮▮ "Because plaintiff is a prisoner challenging a Department of Corrections directive, the *Lemon* test is tempered by the test laid out by the Supreme Court in *Turner v. Safley* [482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ], which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid 'if it is reasonably related to legitimate penological interests.'" *Salahuddin v. Perez*, No. 99 Civ. 10431(LTS), 2006 WL 266574, at *9 (S.D.N.Y. Feb.2, 2006) (citing *Warburton v. Underwood*, 2 F.Supp.2d 306, 316 (W.D.N.Y.1998)). The *Turner* Court articulated four factors that are relevant to the analysis of whether a regulation is reasonably related to legitimate penological interests: "(i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities." *Iqbal v. Hasty*, 490 F.3d 143, 171–72 (2d Cir.2007) (citing *Covino v. Patrissi*, 967 F.2d 73, 78–79 (2d Cir.1992)); *see also Turner*, 482 U.S. at 89–91, 107 S.Ct. 2254. The Court in *Turner* stated in conclusion that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence

and his actions withstand rational review." (LoConte Mem. at 43.) LoConte's assertions that plaintiffs' claims pursuant to the Establishment Clause and Equal Protection Clause apply only to Goord are unwarranted. Moreover, LoConte's statements that plaintiffs cannot prove these claims against him, and that he had no "animus" are conclusory and insufficient to support a motion for summary judg-

ment. The Court interprets LoConte's remaining arguments as joining in those made by the State Defendants, which are discussed *infra.* (*See* Section III.H.2. (addressing personal involvement), Section III.E.2. (addressing "similarly situated" issue), and Sections III.C.2. and III.E.2. (addressing whether defendants actions were reasonably related to legitimate penological interests).)

that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91, 107 S.Ct. 2254.

### 2. Analysis

State Defendants contend that there is no evidence in the record demonstrating that DOCS has established Sunni Islam as the official Islamic religion of DOCS, and that the actions of DOCS thus satisfy the *Lemon* test. (*See* State Defs.' Mem. at 40–41.) State Defendants further assert that plaintiffs "can demonstrate no fact or demographic that suggests an unrepresentative distribution of chaplains to inmates." (*See* State Defs.' Reply Mem. at 11.) Plaintiffs respond that they have proffered evidence sufficient to demonstrate that "DOCS Muslim program establishes, endorses, and promotes Sunni Islam." (Pls.' Opp'n at 74.)

The Court first finds that plaintiffs have offered evidence sufficient to demonstrate a genuine issue of material fact as to whether DOCS' policies violate the Establishment Clause by advancing Sunni Islam over Shi'a Islam and inhibiting plaintiffs' religious practice. Specifically, plaintiffs have proffered evidence that the "generic" Jumah prayer service is "in essence a Sunni Muslim program, not a generic program" (Pls.' 56.1 Opp'n ¶ 13), because it is "led by Sunni Chaplains and prayed in the Sunni manner, and the khutbah's [*sic*] discuss religious topics from a Sunni perspective." (Pugh Decl. ¶¶ 24, 27; *see also* Chatin Decl. ¶ 25; Pls.' 56.1 Opp'n ¶ 16.) Plaintiffs further present evidence that "DOCS' Chaplains claim to promote 'generic' Islam, but in reality they have used their positions to advocate a single form of Islam that does not recognize the legitimacy of different sects within the Muslim faith" and "consider[s] Shi'ite beliefs heretical." (Pugh Decl. ¶ 25; *see also* Chatin Decl. ¶ 26–35.) Plaintiffs point to specific instances in which chaplains providing purportedly "neutral" or "generic" services have "denigrated" Shi'ite beliefs, and called Shi'ites "deviant" and "heretical." (*See* Chatin Decl. ¶¶ 28–35; Pugh Decl. ¶¶ 27–37.) Furthermore, while State Defendants contend that DOCS employs a Shi'ite chaplain coordinator to minister to the approximately 200 Shi'ite Muslim inmates (State Defs.' 56.1 ¶ 23), plaintiffs assert that DOCS' sole Shi'ite chaplain "does not get to lead Shi'ite religious services in any facilities, but instead spends his time as an administrator in DOCS' Central Offices" (Pls.' 56.1 Opp'n ¶ 23). This and other evidence in the record is sufficient to create an issue of fact under *Lemon* that DOCS' policies violate plaintiffs' rights under the Establishment Clause.

Given that plaintiffs have proffered evidence in support of their claim that their constitutional rights under the Establishment Clause have been violated, DOCS must demonstrate that the regulations are "reasonably related to legitimate penological interests" for summary judgment to be appropriate. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. In an effort to make such a showing, State Defendants have listed the various interests served by having one unified Jumah, as opposed to separate services. First, State Defendants proffer evidence that DOCS has an interest in avoiding the administrative problems that would result from having to "take sides" in religious disputes and "entang[le] itself administratively in deciding exclusively religious issues." (State Defs.' Mem. at 30–31; *see also* LoConte Mem. at 33–34.) Second, State Defendants assert that the current policy of one Jumah enhances prison security, because "fragmenting inmate populations into insular groups invites difficulty." (State Defs.' Mem. at 31–32; *see also* LoConte Mem. at 33.) Third, State Defendants cite financial concerns

based on the fact that additional staff would have to be hired to supervise and escort the inmates back and forth from the additional services, and the fact that additional chaplains would have to be hired. (State Defs.' Mem. at 32–33.) Finally, State Defendants cite space concerns, given that space is "at a premium" during the week, and "is difficult to find, furnish, secure and maintain." (*Id.* at 33–34.)

■ The Court finds that disputed issues of fact exist regarding whether the regulations are reasonably related to legitimate penological interests. The Second Circuit held in *Orafan,* and the record reflects here, that there are "unresolved issues of material fact relevant to ... whether the DOC is able to accommodate plaintiffs' request for a Shi'ite-led Friday congregate prayer service without jeopardizing legitimate penological objectives." *Orafan,* 249 Fed.Appx. at 218. For example, plaintiffs have presented evidence that DOCS regularly makes decisions to provide separate religious services to other groups, including Catholics, Protestants, Native Americans, Rastafarians, and Seventh Day Adventists. (*See* Pls.' Opp'n at 47, 61–63.) Plaintiffs further submit evidence that demonstrates that defendants' concerns about hiring additional chaplains could be offset by permitting Shi'ite inmates to lead Jumah services in the absence of Shi'ite chaplains, as Sunnis are allowed to do. (*See* Chatin Decl. ¶ 84; Pugh Decl. ¶ 90.) Plaintiffs further assert that there are several rooms at Mid–Orange where Shi'ites could hold Jumah services at the same time as Sunnis, that Shi'ites could meet after the Sunni service concludes, or that Shi'ites could use the room not used by Rastafarians on Fridays. (*See* Chatin Decl. ¶¶ 77–80; Pugh Decl. ¶¶ 86, 89.) Pugh also asserts that there are empty rooms at Fishkill that could be used. (*See* Pugh Decl. ¶ 86.) He also states that, at Mid–Orange, the area originally designated for the Sunni Jumah could be used for a Shi'ite service, as the Sunnis instead use the gym/chapel space, which is bigger, for their service. (*See* Pugh Decl. ¶ 86.) Finally, plaintiffs state that inmates are not escorted to Jumah services at Fishkill or Mid–Orange, and thus additional escorts would not be needed. (*See* Chatin Decl. ¶ 81; Pugh Decl. ¶ 91.)

■ In light of the decision in *Orafan,* and viewing the evidence in the light most favorable to plaintiffs, the Court finds that there is a material factual dispute as to whether DOCS is able to accommodate plaintiffs so as not to violate their rights under the Establishment Clause "at *de minimis* cost to valid penological interests." *Turner,* 482 U.S. at 91, 107 S.Ct. 2254; *see also Ford v. McGinnis,* 352 F.3d 582, 584 (2d Cir.2003) (remanding to district court for a determination of whether the denial of a religious meal was reasonably related to a legitimate penological interest under *Turner and O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). Accordingly, State Defendants' motion for summary judgment on the claim that DOCS policy violates the Establishment Clause is denied.

### D. The Free Exercise Clause

Defendants next move for summary judgment against plaintiffs' claim that defendants have violated their constitutional and statutory rights to free exercise of Shi'a Islam under the First Amendment. (Second Am. Compl. ¶¶ 131–133.) Defendants argue that plaintiffs have failed to demonstrate that DOCS' policies constitute a substantial burden on their religious beliefs, and that, even if they could make such a showing, the reasonableness of

DOCS' asserted penological interests justifies the burden on plaintiffs' beliefs. (*See* State Defs.' Mem. at 25–40; LoConte Mem. at 17–38.) In response, plaintiffs argue that they have presented triable and disputed issues of fact precluding summary judgment on this claim. (Pls.' Opp'n at 49–57.) For the reasons set forth below, defendants' motions for summary judgment on the Free Exercise claims are denied.

### 1. Legal Standard

 "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford,* 352 F.3d at 588 (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). However, because the religious rights of prisoners must be balanced against the interests inherent in prison administration, free exercise claims of prisoners are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400; *see also Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006); *Ford,* 352 F.3d at 588. Under this reasonableness test, " 'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' " *Id.* (citing *Turner,* 482 U.S. at 89, 107 S.Ct. 2254). This test is less restrictive than the test ordinarily applied to non-prisoner free exercise claims because, as the Court recognized, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400.

 To succeed on a claim under the Free Exercise Clause, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (citing *Ford,* 352 F.3d at 595) (additional citations and internal quotation marks omitted).[10]

---

**10.** Plaintiffs assert that they need not show that the challenged practices constitute a substantial burden on their religious beliefs in order to obtain relief under the Free Exercise Clause, citing to the Second Circuit's explicit refusal to make that finding in *Ford v. McGinnis,* 352 F.3d 582 (2d Cir.2003) and *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006). (*See* Pls.' Mem. at 50 n. 52.) The Ford court noted that "the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims." *Ford,* 352 F.3d at 592. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. *Id.* Likewise, the *Salahuddin* court noted that "[r]esolution of this appeal does not require us to address

*Salahuddin*'s argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement," because defendants "never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion." *Salahuddin,* 467 F.3d at 274–75 & n. 5. The Court then proceeded as if the substantial burden requirement applied. *See id.* Here, the Court will assume that the substantial burden requirement applies, but for a different reason. As discussed *infra,* even assuming *arguendo* that the requirement applies, the plaintiffs have put forth evidence sufficient to demonstrate the existence of disputed issues of material fact relevant to whether the challenged conduct constitutes a "substantial burden" on their religious prac-

## 2. Analysis

### (a) Sincerely–Held Belief

Because courts are "singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs ... an individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (citations and internal quotation marks omitted). The Second Circuit has noted that "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations and vigilantly separate the issue of sincerity from the factfinder's perception of the religious nature of the claimant's beliefs." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

State Defendants essentially concede that the first element, a sincerely-held religious belief, does not lend itself to a decision on summary judgment. (*See* State Defs.' Mem. at 26–27 ("While the record arguably demonstrates that plaintiffs' asserted beliefs are not sincerely held ... such a defense, requiring extensive fact-finding, cannot be established on a motion for summary judgment.").) LoConte however argues that Chatin should be estopped from asserting his claims that his Shi'ite beliefs are sincerely-held because he previously brought suit challenging disciplinary action taken against him for praying in a Sunni manner in the yard at the Green Haven Correctional Facility. (*See* LoConte Mem. at 21–23.) Plaintiffs respond that, in that prior suit, Chatin did not seek the right to pray as a Sunni, but as a Muslim, and that the reason he prayed in the Sunni manner was because he was "under taqiyah," or a form of hiding for protection because he was fearful of identifying himself as a Shi'ite. (Pls.'

Opp'n at 33 (citing Coleman Decl. Ex. 11, at 59, 90 (Transcript of Chatin Deposition)).)

█ The Court finds that while there is no question as to the religious nature of plaintiffs' beliefs, there are genuine issues of fact as to the *sincerity* of plaintiffs' Shi'ite beliefs, including whether Chatin ever espoused Sunni beliefs. Summary judgment is thus not appropriate on this issue. *See Patrick,* 745 F.2d at 157 (sincerity is an issue for the factfinder). Thus, the Court will assume for the purposes of this claim that the plaintiffs' beliefs are sincerely held.

### (b) Substantial Burden

The court in *Ford* summarized the substantial burden test as follows:

> Applying the substantial burden test requires courts to distinguish important from unimportant religious beliefs, a task for which we have already explained courts are particularly ill-suited. Always present is the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent rather than confront the often more difficult inquiries into the sincerity, religiosity and the sufficiency of the penological interest asserted to justify the burden. The substantial burden test, however, presupposes that there will be cases in which it comfortably could be said that a belief or practice is so peripheral to the plaintiff's religion that any burden can be aptly characterized as constitutionally de minimis.

352 F.3d at 593. The *Ford* court went on to note that, while an inquiry as to "[w]hether a practice is religiously mandated is surely relevant to resolving whether a particular burden is substantial,

tice, thus precluding a grant of summary judgment on this claim.

. . . [n]either the Supreme Court nor we, however, have ever held that a burdened practice must be mandated in order to sustain a prisoner's free exercise claim." *Id.* (citation omitted). The relevant question here is thus whether separate Friday Jumah services for Shi'ites "is considered central or important to [plaintiffs'] practice of Islam." *Id.* at 593–94.

Defendants assert that they are entitled to summary judgment on this claim for several reasons. First, defendants claim that the denial of a separate Shi'ite Jumah service does not unconstitutionally burden plaintiffs' religious beliefs. (State Defs.' Mem. at 27–28; LoConte Mem. at 27–31.) State Defendants argue that plaintiffs are permitted to attend a congregate, generic Jumah service along with Sunni inmates, and that some Shi'ite prisoners do in fact attend the generic Jumah services. (State Defs.' Mem. at 27.) State Defendants also assert that plaintiffs and their experts "concede that [Shi'ite] inmates, even if they do not attend a congregate Jumah service, can satisfy any obligatory Friday prayer requirements by praying, individually, the 'Zohr' prayer." (*Id.* at 27; LoConte Mem. at 27–29.) In support of this argument, State Defendants cite *O'Lone,* in which (according to the State Defendants), the Court found that "the New Jersey correctional system did not unconstitutionally burden Muslim inmates' religious exercise in a case in which certain inmates could not attend Jumah services at all." (State Defs.' Mem. at 27.) Second, LoConte argues that plaintiffs "cannot demonstrate that they can doctrinally have the 'religious exercise' they seek to have the defendants create for them" because seven participants are necessary for Jumah, and plaintiffs have not shown that seven Shi'ite Muslims *of the same sect* would participate. (LoConte Mem. at 26.) Finally, LoConte asserts that plaintiffs are not entitled to a spiritual advisor whose beliefs are completely "congruent" with plaintiffs' beliefs, and that the case of *Muhammad v. City of New York Department of Corrections,* 904 F.Supp. 161, 189 (S.D.N.Y.1995), stands for the proposition that the failure to employ a minister of a particular sect was not a substantial burden where the prisoner had access to a generic service, *and* the opportunity to meet with a spiritual advisor. (*See* LoConte Mem. at 30.)

[redacted] The record reveals that there are disputed issues of fact with regard to whether plaintiffs' religious beliefs are substantially burdened by (1) attendance at a Sunni-led, Sunni-dominated Friday Jumah service; and/or (2) use of the Zohr prayer as a substitute for attending Jumah services. Plaintiffs present evidence that, as practicing Shi'ites, they are required to participate in a Friday Jumah prayer service led by a Shi'ite. (*See* Pls.' 56.1 ¶¶ 6, 9, 12–14; Pugh Decl. ¶¶ 11, 16, 18–21, 23–24; Chatin Decl. ¶¶ 2–5, 8–11, 18–19.) They also submit that their beliefs require a Shi'ite Jumah service separate from a service that includes Sunnis, and that a Sunni-led service does not have religious value to them. (Pls.' 56.1 ¶¶ 2–5, 9, 15). Plaintiffs also put forth evidence that the Zohr prayer is not a feasible *permanent* substitute for attending Shi'ite-led Jumah services on a long-term basis. (*See id.* ¶ 111; Pugh Decl. ¶ 14; Chatin Decl. ¶ 6–8.) These assertions are sufficient to demonstrate disputed issues of fact regarding whether the denial of separate services constitutes a substantial burden on plaintiffs' religious exercise. Again, in *Orafan,* the Second Circuit held that summary judgment was inappropriate where the record reflected "unresolved issues of material fact relevant to the question[s] of . . . the burden that the denial of a Friday congregate prayer service placed on plaintiffs' religious exercise. . . ." 249 Fed.Appx. at 218.

Furthermore, State Defendants' reliance on *O'Lone* for the principle that denying Muslim inmates a Jumah service does not substantially burden the rights of Muslim inmates is misplaced. Indeed, the Supreme Court in *O'Lone* found that "Jum'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer," and "[t]here is no question that respondents' sincerely held religious beliefs compelled attendance at Jum'ah." *O'Lone,* 482 U.S. at 345, 107 S.Ct. 2400. The Court in *O'Lone* did not resolve the issue of whether the denial of O'Lone's request to attend Jumah services substantially burdened O'Lones religious beliefs; rather, the Court held that the legitimate penological interests articulated by the defendants in that case were sufficient to deny plaintiffs relief under the Free Exercise Clause. *Id.* at 350–353, 107 S.Ct. 2400 ("While we in no way minimize the central importance of Jum'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end."). As such, *O'Lone* does not stand for the principle that the denial of separate Shi'ite services does not substantially burden plaintiffs' beliefs, as State Defendants suggest.

LoConte's arguments also fail. LoConte contends that plaintiffs' expert testified that members of the various subsects within Shi'a Islam cannot pray together. (*See* LoConte Mem. at 24–25.) Thus, he argues, plaintiffs cannot establish the quorum of seven Shi'ite inmates of the same sect necessary for a valid Jumah, even if they were granted separate services. (*See id.* at 25–26.) . However, this fact is contradicted by the plaintiffs' assertion that they could pray validly behind a Shi'ite of any sect. (*See* Pls.' Opp'n at 38–39 (citing Pugh Decl. ¶ 84–85; Chatin Decl. ¶ 74–75).) Again, summary judgment is inappro-

priate given the existence of these disputed facts. Additionally, LoConte's reliance on *Muhammad v. City of New York, Department of Corrections,* 904 F.Supp. 161, 189 (S.D.N.Y.1995), for the proposition that the failure to employ a minister of a particular belief was not a substantial burden (where the prisoner had access to a generic service and the opportunity to meet with a spiritual advisor), is misplaced. In that case, the court found *after a bench trial* that the failure to employ a Nation of Islam minister and the failure to provide separate worship services to Nation of Islam followers, did not substantially burden the plaintiff's rights under the now-defunct Religious Freedom Restoration Act ("RFRA"). *Id.* at 189–91; (*see also* Pls.' Opp'n at 39–40 & n. 40.) Here, a trial is necessary so that, as in *Muhammad,* the Court can make appropriate findings of fact.

### (c) Reasonably Related to Legitimate Penological Interests

Even if it were determined that DOCS' current policy substantially burdens Shi'ite inmates' rights by denying them a separate Jumah service, the policy nevertheless would be constitutionally permissible if it was reasonably related to legitimate penological interests. *See Turner,* 482 U.S. at 89, 107 S.Ct. 2254; *Ford,* 352 F.3d at 594. As such, defendants argue that summary judgment should be granted because several legitimate penological interests—listed above in Section II.C.2.—justify the DOCS policy denying separate Jumah services to Shi'ite inmates. (*See* State Defs.' Mem. at 30–31; LoConte Mem. at 33–34.)

 Again, the record before the Court reveals that there are disputed issues of fact relevant to defendants' claims that legitimate penological interests justify DOCS policy, which preclude a finding of summary judgment on the Free Exercise

claim. First, with regard to the purported administrative concerns inherent in DOCS having to make religious determinations (*see* State Defs.' Mem. at 30–31; LoConte Mem. at 33), plaintiffs have identified valid factual issues with respect to whether the "provision of [separate] religious services to Shi'ite Muslims—one of two major sects of Islam—is 'excessive entanglement' when DOCS provides [separate] services to Native Americans, Nation of Islam, Rastafarians, Moorish Science Temple, and Seventh Day Adventists, among others." (Pls.' Opp'n at 47, 61–63 (citing to the record to show that DOCS provides services for adherents of the Nation of Islam and the Moorish Science Temple, "two comparatively new American Muslim sects," as well as separate services for Catholics and Protestants); *see also* Section II.C.2.)

Second, while defendants claim that separate services constitute a security risk, plaintiffs offer sufficient evidence to demonstrate that separate services would not engender such a risk, and that combined services might in fact raise greater security concerns. (Pls.' Opp'n at 43–44 (citing Pugh Decl. ¶ 91; Chatin Decl. ¶¶ 81–82; and Coleman Decl. Ex. 17 at 68, Ex. 25 at 123, 128, and Ex. 86 at 104).) Third, plaintiffs point out that if Shi'ite inmates were permitted to lead inmate-facilitated services just as Sunnis are, the financial concerns relevant to hiring new chaplains would not be implicated. (Pls.' Opp'n at 43; Chatin Decl. ¶ 84; Pugh Decl. ¶ 90.) Finally, while Defendants assert that "space concerns" prohibit separate Shi'ite Jumah services, plaintiffs have demonstrated that there is a factual dispute as to whether sufficient space is available in DOCS facilities for separate services. (Pls.' Opp'n at 44 (citing, *inter alia*, Pugh Decl. ¶ 86 and Chatin Decl. ¶¶ 77–78).); *see also Salahuddin v. Coughlin*, 993 F.2d 306, 309 (2d Cir.1993) (holding that "conclusory assertion[s]" that congregate ser-

vices could not be accommodated preclude summary judgment, particularly where it was suggested that congregate religious services could be held in a prison yard without the need for extra supervision).

In light of the foregoing, defendants' motions for summary judgment on the Free Exercise Claim are denied because genuine issues of material fact remain as to "whether the DOC is able to accommodate plaintiffs' request for a [Shi'ite]-led Friday congregate prayer service without jeopardizing legitimate penological objectives." *Orafan*, 249 Fed.Appx. at 218.

### E. Equal Protection

State Defendants also move for summary judgment on plaintiffs' equal protection claim. State Defendants argue that summary judgment is appropriate, because plaintiffs cannot and have not shown that any similarly situated group is treated more favorably than plaintiffs, and, in any event, because DOCS policies withstand rational review. (*See* State Defs.' Mem. at 42–44.) Plaintiffs respond that Shi'ite inmates are treated less favorably than other Muslim and non-Muslim inmates, and that any distinctions made between the services provided to Shi'ites and those provided to other religious groups (including other sects of Islam) are not reasonably related to legitimate penological interests. (*See* Pls.' Opp'n at 57–70.) For the following reasons, State Defendants' motion is denied.

### 1. Legal Standard

■ The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Thus, under the Equal Protection Clause, "all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439,

105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (citing *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)).

The Supreme Court has specifically held that in the prison context, the Equal Protection clause does not require that "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *see also Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence."); *Graham v. Mahmood,* No. 05 Civ. 10071(NRB), 2008 WL 1849167, at *14 (S.D.N.Y. Apr.22, 2008) (citing *Cruz* and finding that if one group of inmates outnumbers another by two-thirds, the groups are not similarly situated).

■ In addition, the Second Circuit has determined that the *Turner* standard, although originally articulated in the context of a first amendment challenge, also applies to equal protection claims. *See Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990); *Dingle v. Zon,* 189 Fed. Appx. 8, 10–11 (2d Cir.2006); *Graham,* 2008 WL 1849167, at *14. Thus, even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are

"reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 574.

## 2. Analysis

■ As discussed above, in order to sustain an equal protection claim at the summary judgment stage, plaintiffs must demonstrate that plaintiffs are "similarly situated" to other prison groups, but are treated differently. The Court finds that plaintiffs have made this showing.

The evidence in the record reflects certain facts that, taken to be true, demonstrate that there were at least 200 inmates professing to be Shi'ites at the time this motion was briefed (*see* State Defs.' 56.1 ¶ 23), and that there are potentially many more (*see* Pls.' 56.1 Opp'n ¶ 23). By comparison, there are approximately 247 inmates who identify themselves as adherents of Native American religions, 205 inmates who identify themselves as Seventh Day Adventists, 203 inmates who identify themselves as adherents of the Moorish Science Temple, 66 inmates who identify themselves as Greek Orthodox, and 63 inmates who identify themselves as Quakers. (*See* Coleman Decl. Ex. 100.) Plaintiffs contend that they are at least similarly situated to these groups. (*See* Pls.' Opp'n at 64); *see also Graham,* 2008 WL 1849167, at *14. Plaintiffs have also proffered evidence that, taken as true, reflects that each of these groups is treated differently than Shi'ites are treated, in that each of these groups is afforded, *inter alia,* the opportunity to attend separate religious services, access to outside volunteer coordinators, religious classes, and/or the opportunity to celebrate holidays. (*See id.* at 63–65 (citing to the record).) Accordingly, the Court finds that plaintiffs have made a showing that, at the very least, there exists a genuine issue of material fact as to whether Shi'ites are similarly situated to other religious

denominations and yet treated differently, in violation of the Equal Protection Clause.

Given the Court's finding that plaintiffs have shown that they are similarly situated to other prison groups yet treated differently, summary judgment would be appropriate only if defendants could show that the distinctions made between Shi'ites and other similarly situated groups were "reasonably related to legitimate penological interests." *Benjamin,* 905 F.2d at 574. However, the record reflects, as demonstrated above, the existence of disputed issues of fact regarding whether DOCS policies relating to the treatment of Shi'ite Muslim inmates are reasonably related to legitimate penological interests under the *Turner* test. *See supra* at Sections III. C.2., and III.D.2.(c); *see also Orafan,* 249 Fed.Appx. at 218. Accordingly, State Defendants' motion for summary judgment on the equal protection claim is denied.

## F. RLUIPA

Defendants next move for summary judgment on plaintiffs' claim that defendants have violated plaintiffs' statutory rights to free exercise of Shi'a Islam under RLUIPA. (Second Am. Compl. ¶¶ 128–130.) First, defendants assert that plaintiffs have failed to demonstrate that any defendant denied them free exercise under RLUIPA. (State Defs.' Mem. at 25–40; LoConte Mem. at 17–39.) Second, defendants contend that summary judgment on the claim for money damages is appropriate because money damages are not available under RLUIPA. (State Defs.' Mem. at 40; LoConte Mem. at 43–44.) Finally, LoConte asserts that RLUIPA is unconstitutional on its face and as applied to him. (LoConte Mem. at 44–50.)

Plaintiffs respond that there are disputed issues of fact that preclude summary judgment on the RLUIPA claims. Plain-

tiffs also contend that money damages are available under RLUIPA. For the reasons that follow, defendants' motion for summary judgment on the RLUIPA claims is denied insofar as plaintiffs seek injunctive and/or declaratory relief. However, because monetary damages are not available under RLUIPA against individual defendants in either their individual or official capacities, plaintiffs' claims for monetary damages under RLUIPA are dismissed. The Court further declines to rule on the constitutionality of RLUIPA in accordance with the doctrine of constitutional avoidance.

### 1. Free Exercise

### (a) Legal Standard

■ RLUIPA "prohibits the government from imposing substantial burdens on religion even where the burden results from a neutral law of general applicability." *Hankins v. Lyght,* 441 F.3d 96, 111 (2d Cir.2006). Specifically, RLUIPA states that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a); *see also Salahuddin,* 467 F.3d at 273–74. Significantly, the burden on defendants pursuant to RLUIPA, which requires that the challenged action must be the "least restrictive means of furthering" a "compelling government interest," is a much higher burden than that articulated in *Turner,* which required only that a burden be "reasonably related

to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. 2254.

 Moreover, under RLUIPA:

If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

42 U.S.C.A. § 2000cc–2(b); *see Graham,* 2008 WL 1849167, at *13 ("Only if a plaintiff shows that his religious exercise has been "substantially" burdened, do the defendants need to show something more than a rational relationship between the policy at issue and a governmental interest."); *see also Salahuddin v. Perez,* 216 Fed.Appx. 69, 71 (2d Cir. Feb.2, 2007) (summary judgment is appropriate where a plaintiff fails to demonstrate the existence of a genuine issue of material fact as to whether the regulation or practice imposed a substantial burden). If the plaintiff does make a showing of a substantial burden, the defendant must then show that the practice "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).[11]

### (b) Analysis

 For the reasons set forth below, defendants' motions for summary judgment on the grounds that plaintiffs have not demonstrated a claim under RLUIPA for violation of their free exercise rights is denied. Put simply, there are disputed issues of material fact as to whether the DOCS policy at issue here is the least restrictive means of furthering a compelling government interest.

### (1) Substantial Burden on Sincerely–Held Beliefs

 As noted above, a plaintiff alleging a RLUIPA violation must first show that defendants substantially burdened his sincerely-held religious beliefs. *See Singh,* 520 F.Supp.2d at 498. "In order to establish that a plaintiff's exercise was substantially burdened [under RLUIPA], a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by

---

**11.** RLUIPA was enacted following the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), on the grounds that it exceeded Congress's authority under the Fourteenth Amendment. *See Marria v. Broaddus,* No. 97 Civ. 8297(NRB), 2003 WL 21782633, at *12 (S.D.N.Y. July 31, 2003); *Fluellen v. Goord,* No. 06 Civ. 602E (HKS), 2007 WL 4560597, at *5 (W.D.N.Y. Mar.12, 2007) ("RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison.") (citations omit-

ted). The statute represents a renewed effort by Congress in the wake of *City of Boerne* to impose a "strict scrutiny" test in cases in which free exercise of religion is substantially burdened. *See Madison v. Riter,* 240 F.Supp.2d 566, 568–70 (W.D.Va.2003). Thus, Congress, in enacting both the RFRA and RLUIPA, sought to restore the "compelling interest/least restrictive means" standard that was previously enunciated by the Supreme Court in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) but later abandoned in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *See Muhammad v. City of New York Dep't of Corr.,* 904 F.Supp. 161, 187 (S.D.N.Y.1995).

his faith." *Graham*, 2008 WL 1849167, at *14 (quoting *Muhammad*, 904 F.Supp. at 189). The interference "must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Id.* However, "while mere inconvenience to the adherent is insufficient to establish a substantial burden, demonstrating a substantial burden is not an onerous task for the plaintiff." *Singh v. Goord*, 520 F.Supp.2d 487, 498 (S.D.N.Y. 2007) (internal citations and quotation marks omitted).

Defendants contend that plaintiffs cannot establish that they have been substantially burdened by the lack of separate Shi'ite services, because they can "practicably pray, they can attend religious classes for [Shi'ite] inmates, and they can have access to literature and participate in various holidays." (State Defs.' Mem. at 37.)

The Court is unpersuaded that summary judgment is appropriate. As discussed *supra* at Section III.D.2.(b), plaintiffs have demonstrated that there are disputed issues of fact precluding summary judgment on the issue of whether the denial of separate Shi'ite services substantially burdens their religious exercise. *See also Orafan*, 249 Fed.Appx. at 218. Because summary judgment is proper only where there are no genuine issues of material fact, summary judgment on the substantial burden element of RLUIPA is inappropriate.[12]

## (2) Least Restrictive Means of Furthering a Compelling Governmental Interest

Assuming as the Court must that plaintiffs can meet the substantial burden prong of the RLUIPA test, State Defendants must then show "that imposition of the burden on [plaintiffs] (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "Congress, in enacting RLUIPA, anticipated that Courts would give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Singh*, 520 F.Supp.2d at 499 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 722–23, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)). However, "prison officials cannot simply use the words 'security' and 'safety,' and expect that their conduct will be permissible." *Id.* (citing *Jolly v. Coughlin*, 76 F.3d 468, 479 (2d Cir.1996)).

The Court has already found that there are disputed issues of fact relating to whether DOCS "is able to accommodate plaintiffs' request for a [Shi'ite]-led Friday congregate prayer service without jeopardizing legitimate penological objectives." *Orafan*, 249 Fed.Appx. at 218; *see supra*

**12.** It is also worth noting that courts have found that restrictions such as those at issue in this case may constitute a substantial burden. *See, e.g., Shakur v. Selsky*, 391 F.3d 106, 120 (2d Cir.2004) (finding that plaintiff demonstrated, under RLUIPA, that DOCS' failure to allow him to attend a feast in celebration of Eid ul Fitr, a Muslim holiday, constituted a substantial burden); *Koger v. Bryan*, 523 F.3d 789, 798 (7th Cir.2008) (holding that denial of a prisoner's request for a special diet constituted a substantial burden under RLUIPA,

even though the prisoner's religion did not require the dietary restriction, but where many followers, including prisoner, chose to practice the restrictions); *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (finding, under RLUIPA, that a plaintiff's religious beliefs are substantially burdened where "a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own").

at Sections III.C.2., and III.D.2.(c). Thus, even if Defendants could demonstrate that DOCS policies, including the Protocol, are "in furtherance of a compelling governmental interest," summary judgment is inappropriate where, as here, there are issues of fact remaining as to whether the Protocol and other policies constitute the "least restrictive means" of furthering that interest. Accordingly, Defendants' motions for summary judgment on the RLUIPA claim are denied.

### 2. Availability of Money Damages

Defendants next assert that RLUIPA does not create a cause of action for money damages against defendants in their official capacities or individual capacities. As such, Defendants argue that summary judgment on the claims for money damages against defendants is appropriate. (*See* State Defs.' Mem. at 40; LoConte Mem. at 43.) Plaintiffs respond that RLUIPA allows plaintiffs to recover money damages under the plain language of the statute. (Pls.' Opp'n at 85–86.) For the reasons that follow, the Court finds that plaintiffs are not entitled to money damages under RLUIPA.

The question of whether plaintiffs may recover monetary damages under RLUIPA is unsettled in this and other circuits. *See Bock v. Gold,* No. 1:05 Civ. 151(JGM)(JJN), 2008 WL 345890, at *7 (D.Vt. Feb. 7, 2008); *see also Smith v. Allen,* 502 F.3d 1255, 1270 (11th Cir.2007) ("To put it mildly, 'there is a division of authority' on this question."); *Marsh v. Granholm,* No. 2:05 Civ. 134(RHB)(TPG), 2006 WL 2439760, at *2 (W.D.Mich. Aug. 22, 2006) (collecting cases recognizing dispute over whether monetary damages are available under RLUIPA); *Daker v. Ferrero,* No. 1:03 Civ. 2481, 2006 WL 346440, at *8 (N.D.Ga. Feb. 13, 2006) (collecting cases); *Farrow v. Stanley,* No. 02 Civ. 567(PB), 2005 WL 2671541, at *11 n. 13

(D.N.H. Oct.20, 2005) (noting that "[t]here is substantial uncertainty, however, as to whether this language even provides a right to money damages."). Given the unsettled nature of this question, and the different rationales employed by courts that have addressed it, the Court will analyze each in turn.

#### (a) Individual Capacity

Defendants cite *Smith v. Allen,* 502 F.3d 1255, 1275 (11th Cir.2007), for the proposition that "RLUIPA imposed restrictions on the recipients of federal funds, and as a such [sic], could not have targeted individual defendants who are not the recipients of such funds." (State Defs.' Supp. Mem. at 6; *see also* LoConte Supp. Mem. at 4.) In *Smith,* the Eleventh Circuit found that claims against defendants in their individual capacities could not lie under RLUIPA because "such action would be incongruent with the reach of Congress' Spending Power . . . ." 502 F.3d at 1275. The Eleventh Circuit reasoned that, because RLUIPA was enacted under the Spending Clause of the Constitution, Congress could "award federal funds to state prison institutions who, as a condition of receiving federal funds, agree not to impose 'a substantial burden on the religious exercise' of its prisoners." *Id.* at 1274 (quoting 42 U.S.C. § 2000cc–1(a)). However, the court found that individual defendants were not, at least in their individual capacities, "contracting" parties who received federal funds. *Smith,* 502 F.3d at 1275. Because of this, the court found that "a construction of RLUIPA providing for individual liability [for monetary damages] raises substantial constitutional concerns" and "would be incongruent with the reach of Congress' spending power." *Id.* The court also found that because RLUIPA did not permit the recovery of money damages against defendants in their individual capacities, the court "need not address the

secondary question of whether the defendant-appellees would be entitled to a defense of sovereign immunity." *Id.* at 1275 n. 11 (citation omitted).

The Court finds the reasoning in *Smith* to be convincing, and concludes that RLUIPA does not provide for the availability of money damages against defendants in their individual capacities. In so doing, the Court joins the other district courts, some in recent months, that have recently held such damages to be unavailable. *See, e.g., Sisney v. Reisch,* 533 F.Supp.2d 952, 968–73 (D.S.D.2008) (citing Smith and holding that RLUIPA does not permit a private action for monetary damages against individual defendants); *Sharp v. Johnson,* No. 00 Civ. 2156(ARH), 2008 WL 941686, at *19 (W.D.Pa. Apr.7, 2008); *Gibb v. Crain,* No. 6:04 Civ. 81, 2008 WL 744249, at *3 (E.D.Tex. Mar. 19, 2008) (same); *Malik v. Ozmint,* No. 8:07 Civ. 387(RBH)(BHH), 2008 WL 701517, at *12 (D.S.C. Feb. 13, 2008); *Bock,* 2008 WL 345890, at *7 (RLUIPA does not allow for monetary damages against state employees in any capacity); *Daker,* 475 F.Supp.2d at 1334; *Boles v. Neet,* 402 F.Supp.2d 1237, 1241 (D.Colo.2005) ("[W]hile the statute permits 'appropriate relief against a government' it does not appear that the statute permits a claim for damages."). As noted at oral argument, the cases cited by plaintiffs engage in little or no analysis regarding the availability of individual capacity money damages, and are thus unpersuasive authority. *See Orafan v. Goord,* No. 00 Civ.2022(LEK)(RFT), 2003 WL 21972735, at *9 (N.D.N.Y. Aug. 11, 2003); *Bowman v. Pa. Dep't of Corrs.,* No. 04 Civ. 2176(JFM), 2005 WL 2234647, at *7 (M.D.Pa. Sept.14, 2005); *Jama v. United States Immigration and Naturalization Serv.,* 343 F.Supp.2d 338, 375 n. 27 (D.N.J.2004) (analyzing the availability of money damages under RFRA, and noting,

in *dicta,* that "several courts have interpreted language in RLUIPA (that is nearly identical to the language of § 2000bb–1(c)) to allow for suits against individual defendants for damages").

Accordingly, the Court finds that damages are not available against defendants in their individual capacities under RLUIPA.

### (b) Official Capacity

Courts are also split on the issue of whether monetary damages are available under RLUIPA against an individual in his or her official capacity. *Compare Smith,* 502 F.3d at 1275 (allowing claims for monetary damages to proceed against defendants in their official capacities); *Sisney,* 533 F.Supp.2d at 968–73 (same); *Hankins v. New York State Dep't of Corr. Serv.,* No. 9:07 Civ. 408(FJS)(GHL), 2008 WL 2019655, at *7 n. 50 (N.D.N.Y. Mar. 10, 2008) ("It appears that, after the enactment of RLUIPA in 2000, states could accept federal funds for prison activities or programs only on the condition that they comply with RLUIPA, which effectively constituted a waiver of their sovereign immunity under the Eleventh Amendment."); *with Lovelace v. Lee,* 472 F.3d 174, 193–94 (4th Cir.2006) (holding that money damages are not available under RLUIPA against defendants sued in their official capacity); *Madison v. Commonwealth of Virginia,* 474 F.3d 118, 122–23 (4th Cir. 2006) (same); *Bock,* 2008 WL 345890, at *6 ("RLUIPA does not create a claim for monetary damages against the defendants in their official capacities."); *Agrawal v. Briley,* No. 02 Civ. 6807(RRP), 2006 WL 3523750, at *9–13 (N.D.Ill.Dec.6, 2006) (same). Once again, the question is unresolved in this Circuit. The operative issue is whether New York, in accepting federal funds pursuant to RLUIPA, has waived sovereign immunity as to money damages, given RLUIPA's provision authorizing

"appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The Court finds that it has not.

In *Lovelace v. Lee*, the Fourth Circuit held that, based on *Madison v. Commonwealth of Virginia*, 474 F.3d 118 (4th Cir. 2006), an opinion issued the same day, monetary damages are not available against defendants in their official capacities, because to hold otherwise would violate the State's sovereign immunity under the Eleventh Amendment. 472 F.3d at 193–94. The court in *Madison* held that the state of Virginia had not waived its Eleventh Amendment immunity because the language in RLUIPA allowing for "appropriate relief against a government" "[fell] short of the unequivocal textual expression necessary to waive State immunity from suits for damages." *Madison*, 474 F.3d at 131–32. The court in *Madison* also cited *Webman v. Federal Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C.Cir. 2006), wherein the D.C. Circuit held that the RFRA's identical "appropriate relief" provision was insufficient to waive federal sovereign immunity for damages suits. *Id.* at 132; *see also Jama*, 343 F.Supp.2d at 373; *Commack Self–Service Kosher Meats Inc. v. New York*, 954 F.Supp. 65, 69 (E.D.N.Y.1997); *Keen v. Noble*, No. 04 Civ. 5645(AWI), 2007 WL 2789561, at *8 (E.D.Cal. Sept.20, 2007); *Presley v. Edwards*, No. 04 Civ. 729(WKW), 2007 WL 174153, at *13 (M.D.Ala. Jan.19, 2007).

However, in *Smith v. Allen*, 502 F.3d 1255 (11th Cir.2007), the Eleventh Circuit came to the opposite conclusion. In that case, the court found that "[t]he Supreme Court has instructed that, where Congress had not given any guidance or clear indication of its purpose with respect to remedies, federal courts should presume the availability of all appropriate remedies." *Smith*, 502 F.3d at 1270 (citing *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60,

68–69, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (citations omitted)). The court reasoned that

> In *Franklin*, the issue before the Court was what types of remedies were available in a private right of action for sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Although the statute was silent as to what remedies were available, the court stated that it was appropriate for a court to "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." 503 U.S. at 66, 112 S.Ct. at 1032. Thus, absent any intent to the contrary reflected in the statute, the Court instructed that the presumption should be in favor of all available relief—both injunctive and monetary. *Id.* at 73, 112 S.Ct. at 1036.

*Id.* at 1270. The court went on to address the sovereign immunity issue, finding that it had already previously held that "section 3 of RLUIPA effectuated a clear waiver of the state's sovereign immunity under the Eleventh Amendment" in *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). *Id.* at 1276. In *Benning*, the court found "that RLUIPA's statutory language, conditioning the receipt of federal funds on adherence to the statute and providing that a plaintiff may seek 'appropriate relief when the statute is violated, made clear that 'by accepting federal funds, [the state] waived its immunity under RLUIPA,' and found that 'Congress unambiguously required states to waive their sovereign immunity from suits filed by prisoners to enforce RLUIPA.' " *Id.* at 1276 (citing *Benning*, 391 F.3d at 1305–06).

The Court finds that the reasoning of *Madison* and *Webman* is more persuasive than that of *Smith* on this issue, and agrees that "RLUIPA's 'appropriate relief against a government' language falls short

of the unequivocal textual expression necessary to waive State immunity from suits for damages." *Madison,* 474 F.3d at 131–32. "To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (citing *United States v. Nordic Vill., Inc.,* 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)); *Close v. State of N.Y.,* 125 F.3d 31, 39 (2d Cir.1997) ("[W]e refuse to deny the States their Eleventh Amendment sovereign immunity unless: (1) Congress evinced a clear and unequivocal intent to hold the States liable in federal court; and then (2) a state voluntarily engaged in that particular activity.").

Here, the term "appropriate relief against a government" makes no mention of compensatory or other damages, and thus is insufficient to provide the unambiguous waiver necessary for a finding that New York, by accepting federal funds, waived its right to sovereign immunity on claims for money damages under RLUIPA. *See, e.g., Bock,* 2008 WL 345890, at *6 ("Unlike 42 U.S.C. § 1983 which explicitly creates 'an action at law,' RLUIPA only creates an action for 'appropriate relief' which is at best an ambiguous extension to monetary claims. Therefore, RLUIPA does not create a claim for monetary damages against the defendants in their official capacities."); *Agrawal,* 2006 WL 3523750, at *9 ("Even if RLUIPA were construed to effect a waiver of state sovereign immunity as to certain kinds of claims, the court agrees with the D.C. Circuit in *Webman* and the district court in *Limbaugh [v. Thompson,* No. 2:93 Civ. 1404(WHA), 2006 WL 2642388 (M.D.Ala. Sept. 14, 2006) ] that the term 'appropriate relief' is too ambiguous to extend that waiver of immunity to cover claims for monetary damages.").

Accordingly, defendants' motions for summary judgment on plaintiff's RLUIPA claim, insofar as the claim is for money damages against individuals in their individual or official capacities, is granted.

### 3. Constitutionality of RLUIPA

█ Alternatively, defendant LoConte argues that RLUIPA is unconstitutional on its face, and as applied to him, because it exceeds Congress's power to enact legislation under the Commerce Clause and the Spending Clause, and is barred by the Tenth Amendment. (*See* LoConte Mem. at 44–50.) The United States, intervenor in this case, contends that RLUIPA is constitutional, and that in any event, the doctrine of constitutional avoidance "might obviate the need to consider RLUIPA's constitutionality." (Govt's Mem. at 7–8.) For the reasons that follow, the Court declines to rule on the constitutionality of RLUIPA under the Spending Clause, given that the Court has already granted summary judgment in favor of LoConte on plaintiffs' RLUIPA claim.

At the outset, the Court notes that the Second Circuit recently held in *Westchester Day School* that "where the relevant jurisdictional element is satisfied, RLUIPA constitutes a valid exercise of congressional power under the Commerce Clause." 504 F.3d at 354. The court also held that RLUIPA does not violate the Tenth Amendment. *See id.* at 354–55. Therefore, LoConte's only remaining facial challenge is his argument that RLUIPA is unconstitutional in that it exceeds Congress's authority under the Spending Clause.

█ The doctrine of constitutional avoidance states that if a case can be decided on other than constitutional grounds, the court should avoid reaching the constitutional issue. *Slack v. McDaniel,* 529 U.S. 473, 485, 120 S.Ct. 1595, 146

L.Ed.2d 542 (2000) (citing *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936)). This rule, known also as the *Ashwander* rule, finds its origins in the *Ashwander* case, in which Justice Brandeis observed:

> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

*Ashwander*, 297 U.S. at 347, 56 S.Ct. 466 (Brandeis, J., concurring).

Here, the Court declines to decide the constitutional question, given that defendant LoConte was the only defendant to raise the argument, and the Court has already granted LoConte's motion for summary judgment on the RLUIPA claim on the grounds that money damages, the only remedy sought against LoConte under RLUIPA, are unavailable.

### G. Qualified Immunity

Defendants next contend that qualified immunity shields them from money damages based on plaintiffs' § 1983 claims because their conduct did not violate clearly established rights. (State Defs.' Mem. at 45–50; LoConte Mem. at 40–42.) Plaintiffs respond that defendants violated clearly established rights and their actions were not objectively reasonable. (Pls.' Opp'n at 76–83.) For the reasons that follow, the Court finds that defendants are not entitled to qualified immunity at this stage of the proceedings.

#### 1. Legal Standard

Section 1983 permits a plaintiff to seek money damages from government officials who have violated the plaintiff's constitutional rights. *See Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). However, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Luna v. Pico*, 356 F.3d 481, 490 (2d Cir.2004); *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir.2003).

A defendant will thus not be liable for damages "if he did not violate clearly established law or if it was objectively reasonable for him to believe that he was not violating clearly established law." *Luna*, 356 F.3d at 490 (citing *Anderson*, 317 F.3d at 197 and *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir.2001)). Courts should look "to both 'the clarity of the law establishing the right allegedly violated' as well as 'whether a reasonable person, acting under the circumstances confronting a defendant, would have understood' that his actions were unlawful." *Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir.2003) (quoting *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir.2001)); *see also Ford*, 352 F.3d at 596–97. "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Anderson*, 317 F.3d at 197 (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998)); *Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir.1999). "The question is not what a lawyer would learn or intuit from researching case law, but what a

reasonable person in the defendant's position should know about the constitutionality of the conduct." *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999); *see also Nicholas,* 189 F.3d at 195 (" '[T]he inquiry is not whether plaintiff has alleged a violation of an abstract legal standard, but whether under the particular circumstances alleged, defendants could have reasonably believed that they did not violate plaintiff's constitutional rights.' ") (quoting *Gittens v. Lefevre,* 891 F.2d 38, 42 (2d Cir.1989)).

### 2. Analysis

The Court finds that the individual defendants are not entitled to qualified immunity at the summary judgment stage because plaintiffs have alleged facts sufficient to demonstrate the denial of a clearly established right, and because genuine issues of material fact exist as to whether the denial of plaintiffs' right to a reasonable opportunity to worship was justified by legitimate penological interests.

Pursuant to *Wilson v. Layne* and other precedent, the first question is whether plaintiffs have established that the actions of the individual defendants violated "clearly established law." 526 U.S. at 609, 119 S.Ct. 1692. Plaintiffs cite several cases in support of the established principles that prisoners are to be afforded "reasonable opportunities to worship," [13] that the Jumah is to be performed congregationally,[14] and that an inmate is denied the opportunity to participate in group worship where the only option is " 'under the guidance of someone whose beliefs are different from or obnoxious to his.' " [15]

Certain of the cases cited by plaintiffs *do* provide that plaintiffs are entitled to a reasonable opportunity to worship. *See Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. 1079; *Young,* 866 F.2d at 570; *see also Ford,* 352 F.3d at 597 ("[W]e also have found it well established that a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock ....") (citing *Salahuddin,* 993 F.2d at 308). While plaintiffs have cited no cases for the proposition that Shi'ites are entitled to separate religious services, recent Second Circuit case law reflects that no such specific pronouncement is necessary for a finding that a clearly established right existed. *See Ford,* 352 F.3d at 597 ("[C]ourts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the right to be clearly established.") (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *Salahuddin,* 467 F.3d at 275–76. Specifically, in *Salahuddin v. Goord,* 467 F.3d 263, 275–76 (2006), the plaintiff brought an action against prison officials claiming, *inter alia,* that a joint Ramadan service for Shi'ite and Sunni prisoners violated his rights under the Free Exercise Clause of the First Amendment, as well as RLUIPA. The court first found that the plaintiff had presented facts which demonstrated a violation of plaintiff's rights under RLUIPA and the First Amendment, and that unresolved issues of fact precluded summary judgment. *Id.* at 275. The court went on to reject defendants qualified immunity argument, noting that "because it was clearly established at the time

---

**13.** *See* Pls.' Opp'n at 76–77 (citing *Cruz,* 405 U.S. at 322 n. 2, 92 S.Ct. 1079, *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989), and *Griffin v. Coughlin,* 743 F.Supp. 1006, 1029 (N.D.N.Y.1990)).

**14.** *See id.* (citing *Salahuddin,* 993 F.2d at 307).

**15.** *See id.* (quoting *Muhammad,* 904 F.Supp. at 191 n. 39 and citing *Marria,* 200 F.Supp.2d at 296).

of the alleged violations that prison officials may not substantially burden inmates' right to religious exercise without some justification and because we cannot say as a matter of law that it was objectively reasonable for any defendant to believe that the facts as they stand on summary judgment showed no violation of a clearly established right." *Id.* at 275–76.

Although this Court questions whether the "clearly established right" recognized in *Salahuddin*—that "prison officials may not substantially burden inmates' right to religious exercise without some justification," 467 F.3d at 275–76—meets the requirements of *Anderson v. Recore*, 317 F.3d at 197 (2d Cir.2003), described above, the Court is bound by that precedent. Accordingly, consistent with *Salahuddin*, the Court finds that plaintiffs have put forth facts sufficient to demonstrate that plaintiffs' right to a reasonable opportunity to worship—by way of separate Jumah services for Shi'ites and Sunnis—was clearly established.

Assuming the violation of a clearly established right, defendants nevertheless argue that "it was objectively reasonable for [defendants] to believe that [they were] not violating clearly established law." *Luna*, 356 F.3d at 490. The Second Circuit has held that qualified immunity is not appropriate at the summary judgment stage where genuine issues of material fact exist as to whether defendants had legitimate penological justifications for denying plaintiffs certain opportunities for religious exercise. *See Salahuddin*, 467 F.3d at 276 ("[W]e cannot say as a matter of law that it was objectively reasonable for any defendant to believe that the facts as they stand on summary judgment showed no violation of a clearly established right. Accordingly, these issues remain to be resolved in further proceedings."); *Ford*, 352 F.3d at 597 ("[I]nasmuch as defendants

premise their qualified immunity defense on their reasonable penological interest . . . we find it premature to address the issue."); *see also Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."); *Weyant v. Okst*, 101 F.3d 845, 857–58 (2d Cir.1996); *Beckles v. Bennett*, No. 05 Civ.2000(JSR), 2008 WL 821827, at *26 (S.D.N.Y. Mar.26, 2008); *Woods v. Goord*, No. 01 Civ. 3255(SAS), 2002 WL 731691, at *10 (S.D.N.Y. Apr.23, 2002). The Court is bound by this precedent, and concludes that issues of fact surrounding the reasonableness of defendants' beliefs that burdening plaintiffs' religious practice was justified by legitimate penological interests preclude a grant of qualified immunity to defendants. (*See supra* at Sections II.C.2, II.D.2.(c), and II.E.2.)

### H. Personal Involvement

As an alternative to their qualified immunity argument, State Defendants also assert that plaintiffs have failed to establish the personal involvement of individual defendants other than Goord in policy decisions, and that an award of damages under § 1983 is therefore inappropriate. (*See* State Defs.' Mem. at 44.) Plaintiffs respond that all defendants were personally involved in the violations. (Pls.' Opp'n at 83–85.) The Court agrees, and finds that plaintiffs have adequately established personal involvement with respect to each defendant.

#### 1. Legal Standard

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir.1991). The Second Circuit has concluded that the

following levels of involvement are sufficient to constitute "personal involvement:"

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)); *see also Moffitt,* 950 F.2d at 886; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). Significantly, supervisory officials may not be held liable merely because they held a position of authority, absent evidence that they had some personal involvement pursuant to the requirements above. *See Wright,* 21 F.3d at 501.

### 2. Analysis

Viewing the evidence in the light most favorable to plaintiffs as the Court must on a motion for summary judgment, the Court finds that plaintiffs have proffered evidence sufficient to show that all defendants were personally involved in the deprivation of plaintiffs' rights.

#### (a) Defendant Goord

■ Plaintiffs have proffered evidence to show that Commissioner Goord "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom" under *Colon.* 58 F.3d at 873. By his own admission, Goord, as the Commissioner of DOCS, acknowledges that he is "ultimately responsible for everything," including "responsibility for determining what religious programs inmates should have." (Coleman Decl. Ex. 57 at 34.) Indeed, State Defendants appear to concede that Goord "has ultimate policymaking authority," although they deny, without citation to any evidence, that Goord "intentionally discriminated against plaintiffs." (State Defs.' Mem. at 44.) There is no dispute that Goord approved the decision to implement the Protocol in the fall of 2001, and he was clearly aware that DOCS policy denied Shi'ite inmates separate services and provided for only one congregate Jumah service for both Sunnis and Shi'ites. (*See* Coleman Decl. Ex. 57 at 111–15.) Accordingly, Goord "allowed the continuance" of this policy, and was thus personally involved in the alleged violations.

#### (b) Defendant LoConte

■ Plaintiffs have also put forth evidence that LoConte was personally involved in the alleged violations. Although they note that LoConte was not "the ultimate authority," State Defendants acknowledge that LoConte was personally involved in the decision to deny plaintiffs a separate Jumah service because he made "certain contributions" to "formulation of policy." (*See* State Defs.' 56.1 ¶ 124.). Indeed, the record before the Court reveals that LoConte authored and published the Protocol, was DOCS' so-called "expert" on the development of the Protocol, and directed DOCS' staff that "there is no reason to provide separate accommodations for Shi'ite Muslims." (*See* Pls.' Opp'n at 84 n. 73 (citations omitted).) Accordingly, plaintiffs have sufficiently demonstrated LoConte's personal involvement in the alleged constitutional violations.

#### (c) Defendant Leonard

■ Plaintiffs have also shown personal involvement on the part of defendant

Leonard. Again, State defendants admit that Leonard was personally involved in the denial of separate services to Shi'ites because he made "certain contributions" to "formulation of policy," despite the fact that he was not "the ultimate authority." (*See* State Defs.' 56.1 ¶ 124.). Additionally, plaintiffs have shown that Leonard, as LoConte's successor as Director of Ministerial and Family Services, failed to reevaluate the Protocol after he took over from LoConte. (*See* Coleman Decl. Ex. 61 (Leonard Dep. Tr.) at 94–96, 104.) Accordingly, plaintiffs have shown that Leonard "allowed the continuance," *Colon,* 58 F.3d 865, of the Protocol, which denied Shi'ite inmates separate services. Accordingly, plaintiffs have sufficiently demonstrated Leonard's personal involvement in the alleged constitutional violations.

### (d) Defendant Nuttal

■ Plaintiffs have also put forth evidence to show that Nuttal, the Deputy Commissioner for Program Services, was involved in ongoing discussions about policy regarding separate Shi'ite religious services, as well as the legitimate penological interests that were served in denying Shi'ites separate services. (*See* Coleman Decl. Ex. 56 (Nuttal Dep. Tr.) at 50–52.) (Ex. 57 at 82–83.) Nuttal was also involved in the creation and development of the Protocol and the decision that Shi'ites and Sunnis could worship together. (*See* Coleman Decl. Ex. 56 (Nuttal Dep. Tr.) at 34–36; State Defs.' 56.1 ¶ 124.) Accordingly, plaintiffs have presented sufficient evidence to demonstrate Nuttal's personal involvement.

### (e) Defendant Headley

■ Plaintiffs have also presented evidence sufficient to show at this stage that defendant Headley, Former Deputy Commissioner for Program Services, was personally involved in the alleged constitutional violations because he made contributions to the policy underlying the Protocol. (*See* State Defs.' 56.1 ¶ 124; Coleman Decl. Ex. 21 at 233.) While Headley's mere distribution of the Protocol (*see* Coleman Decl. Exs. 6, 50) would perhaps not be enough to establish his personal involvement, the Court finds that there are genuine issues of material fact as to the extent of Headley's involvement in the development of the Protocol, and that plaintiffs have put forth evidence indicating that he had at least some involvement in its implementation. (*See* State Defs.' 56.1 ¶ 124; Coleman Decl. Ex. 21 at 233.)

### (f) Defendant Umar

■ Although Umar has not himself moved for summary judgment, nor officially joined in defendants' motions, the Court finds that plaintiffs have also presented evidence that Umar, as former Ministerial Program Coordinator for Islamic Affairs both "participated directly in the alleged constitutional violation," and "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. Certain defendants testified that Umar was consulted on issues relating to Muslim inmates' requests, including whether Shi'ites should have separate services. (*See* Coleman Decl. Ex. 21 (LoConte Dep. Tr.) at 118–20; Ex. 57 (Goord Dep. Tr.) at 86–87; Ex. 84 (Harris Dep. Tr.) at 27–28, 35.) Plaintiffs also point to evidence that Umar espoused views—in one case directly to inmates and in another to LoConte—that Shi'ites were "deviant," "heretics," and not accepted as a valid Islamic movement. (Pugh Decl. ¶ 31; Coleman Decl. Ex. 21 (LoConte Dep. Tr.) at 118–19, 193–94; *see also* Ex. 105 (Letter from Umar to Harris informing Harris that "the only legitimate name of the Muslim religion is 'Islam' "

and directing Harris to remove certain religious designation codes.)) Chatin testified that Umar, when asked by Shi'ite inmates at Elmira Correctional Facility why Shi'ites could not have separate accommodations, stated that "there is no such thing as a Shi'ite" and "Shi'ites don't exist." (Chatin Decl. ¶ 30.) This evidence is enough to create a genuine issue of material fact with respect to whether Umar was personally involved in the violations, namely, whether he participated in the creation of a policy that denied plaintiffs a separate Jumah service.

### (g) Defendants Mazzuca, Perez, and Harris

■ Plaintiffs have also shown personal involvement on the part of defendants Mazzuca, Perez, and Harris.

Courts in this Circuit have generally held that the second *Colon* factor requires more than the mere affirmation of a grievance denial and subsequent inaction. *See, e.g., Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007) (finding no personal involvement where plaintiff alleged only that the defendant denied his grievance); *Collins v. Goord,* 438 F.Supp.2d 399, 420 (S.D.N.Y.2006) (same); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). "Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002); *see also Colon,* 58 F.3d at 873; *Islam v. Fischer,* No. 07 Civ. 3225(PKC), 2008 WL 110244, at *3 (S.D.N.Y. Jan.9, 2008); *Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *10 (S.D.N.Y. Sept.18, 2003); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at *13 (S.D.N.Y. Apr. 23, 2002); *Van Pelt v. Finn,* No. 92 Civ. 2977(MBM), 1993 WL 465297, at *6 (S.D.N.Y. Nov.12, 1993).

The record reflects, *inter alia,* that on January 7, 2000, Fishkill Superintendent Mazzuca rendered a decision on the plaintiffs' consolidated grievance, stating that "[t]he Sh'ia Muslim inmates have been told by Imam Muhammad that until we get clarification from Counsel's Office in Albany regarding a court case pending, the Sh'ia Muslims are to be afforded the same type service as all Islamic inmates." (Pugh Decl. Ex. G at D0841.) On January 9, 2001, Mazzuca also ruled on another grievance from Chatin, stating that "the facility will provide services for Shia' Muslim inmates as soon as we receive direction from Central Office." (*See* Coleman Decl. Ex. 78 at D0002.) The record also shows that defendant Perez, former Deputy Superintendent for Program Services at Fishkill, conducted an investigation into the claims in plaintiffs' grievances and made recommendations (*see, e.g.,* Chatin Decl. ¶ 39 & Ex. B at D0850); indeed, Mazzuca's January 7, 2000 decision on the consolidated grievance is cc'd to defendant Perez (Pugh Decl. Ex. G at D0841). Finally, evidence in the record demonstrates that Harris, Deputy Superintendent of Programs at Fishkill, was made aware of plaintiffs' complaints regarding the religious accommodations being provided to Shi'ite inmates. (*See e.g.,* Chatin Decl. ¶¶ 41–42 & Exs. F, G.) Harris responded to Chatin on at least one occasion, telling Chatin that "[t]he Imam is charged with the responsibility of carrying out all the dictates of the religion of Islam. I am sure he will be more than happy to include you in the celebration (of Ramadan)." (Chatin Decl. Ex. F.)

The Court finds that the evidence in the record supports plaintiffs' assertion that defendants Mazzuca, Perez, and Harris were all personally involved in the alleged

constitutional violations. Plaintiffs have, at the very least, created a genuine issue of fact as to whether Mazzuca had more involvement than just affirming the denial of a grievance, or ignoring a letter sent to him from an inmate. Plaintiffs have shown that Mazzuca considered several grievances, and received several letters from inmates, including plaintiffs. Indeed, it appears that Mazzuca responded to plaintiffs, stating that "until we get clarification from Counsel's Office in Albany regarding a court case pending, the Sh'ia Muslims are to be afforded the same type service as all Islamic inmates" (Pugh Decl. Ex. G at D0841) and that he would take affirmative action on plaintiffs' request "as soon as [he] receive[d] direction from Central Office" (Coleman Decl. Ex. 78 at D0002). Plaintiffs have proffered similar evidence relating to defendant Harris, namely that he *responded* to plaintiffs' complaints on at least one occasion. (*See* Chatin Decl. ¶¶ 41–42 & Exs. F, G.) Thus, plaintiffs have pointed to facts, which, taken as true, demonstrate that Mazzuca and Harris, "after being informed of the violation through a report or appeal, failed to remedy the wrong" and were thus personally involved in the alleged violations. *Colon,* 58 F.3d at 873. Finally, plaintiffs have also proffered evidence that defendant Perez was the DOCS employee who conducted the investigations into plaintiffs' grievances, and made recommendations to the Superintendent. (*See* Chatin Decl. ¶ 39 & Ex. B at D0850; Pugh Decl. Ex. G at D0841.) As such, the Court finds that she, "after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon,* 58 F.3d at 873. Thus, plaintiffs have proffered facts sufficient to show that Perez was personally involved in the alleged deprivation of plaintiff's rights.

Accordingly, the Court finds that viewing the facts in the light most favorable to plaintiffs, plaintiffs have proffered evidence sufficient to show that all defendants were personally involved in the alleged deprivation of plaintiffs' rights to a reasonable opportunity to practice their Shi'ite beliefs.

## I. Injunctive Relief Against Individual Defendants

State Defendants also assert that injunctive relief is not available against the individual defendants, as the individual defendants had no role in administering or enforcing the policies at issue. (*See* Pls.' Mem. at 45.) For the reasons that follow, the Court finds that injunctive relief is available against certain individual defendants, and thus State Defendants' motion for summary judgment on the issue of injunctive relief is denied.

### 1. Legal Standard

Section 1983 of Title 42 of the United States Code provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, *suit in equity, or other proper proceeding for redress . . . .*

(emphasis added). It is well settled that the Eleventh Amendment "does not preclude suits against state officers in their official capacity for prospective injunctive relief to prevent a continuing violation of federal law." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 287 (2d Cir.2003) (citing *Ex parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 52 L.Ed. 714 (1908) and *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)); *see also Ippolito v.*

*Meisel,* 958 F.Supp. 155, 161 (S.D.N.Y. 1997) (holding that "federal courts can enjoin state officers acting in their official capacity, as long as the injunction only governs the officer's future conduct and a retroactive remedy is not provided") (citing *Russell v. Dunston,* 896 F.2d 664, 668 (2d Cir.1990)).

In *Ex parte Young,* 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court held that "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act...." Courts in this Circuit have since applied the holding in *Ex parte Young* to require only that a defendant have a "connection" with the act, and not more. *See In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 372–73 (2d Cir.2005); *Davidson v. Scully,* 148 F.Supp.2d 249, 254 (S.D.N.Y.2001) (holding that as long as the state official "has a direct connection to, or responsibility for, the alleged illegal action," injunctive relief against that individual is permissible. (citation and internal quotation marks omitted)); *Reynolds v. Blumenthal,* No. 04 Civ. 218(PCD), 2006 WL 2788380, at *8 (D.Conn. Sept.26, 2006) (citing *In re Dairy Mart* and finding that "personal action or involvement on the part of the named official is not required."); *Merritt Parkway Conservancy v. Mineta,* No. 05 Civ. 860(MRK), 2005 WL 2648683, at *8 (D.Conn. Oct.14, 2005) (citing *In re Dairy Mart* ); *cf. Bray v. City of New York,* 346 F.Supp.2d 480, 492 (S.D.N.Y.2004) (enjoining unnamed defendants, including "the City and its police officers and agents" "from seizing bicycles used by participants in the October 29, 2004 Critical Mass bike ride").

### 2. Analysis

At the outset, plaintiffs acknowledge that defendants LoConte, Umar, Headley, and Perez are no longer employees of DOCS and thus may no longer be subject to a prospective injunction. (Pls.' Opp'n at 75 n. 65.) However, plaintiffs assert that injunctive relief is still appropriate against defendants Goord, Leonard, Nuttal, Mazzuca, and Harris. (*Id.*) State Defendants argue that the claims for injunctive relief against the individual defendants should be dismissed except for the claim against defendant Goord, because those defendants lack the authority to impose the type of injunctive relief sought. (State Defs.' Mem. at 45.)

 As discussed above, the Court has found that defendants Goord, Leonard, Nuttal, Mazzuca, and Harris all had personal involvement in the violations of plaintiffs' rights to a reasonable exercise of their Shi'ite beliefs. (*See infra* at Section II.H.2.) Accordingly, the Court finds that these defendants had a "connection" to the acts at issue sufficient to render them proper defendants for purposes of prospective injunctive relief. *See In re Dairy Mart,* 411 F.3d at 372–73; *Davidson,* 148 F.Supp.2d at 254.

In support of their argument, State Defendants cite only *Curtis v. Pataki,* No. 96 Civ. 425(RSP), 1997 WL 614285, at *6 (N.D.N.Y. Oct.1, 1997), for the proposition that, "where the DOCS Commissioner is authorized to administer and enforce departmental policy, he is [the] only proper defendant for prospective injunctive relief." Yet, in *Curtis,* the only case cited by State Defendants in support of their argument, the court held only that "[w]hen a plaintiff seeks a declaration that a particular statute is unconstitutional, the proper defendants are the government officials charged with the administration and enforcement of the statute." *Curtis,* 1997 WL 614285, at *5 (citing *New Hampshire Right to Life Comm. v. Gardner,* 99 F.3d

8, 13 (1st Cir.1996)). In *Curtis,* the plaintiff alleged claims only against then-Governor Pataki and then-DOCS Commissioner Coombe. The court found that Coombe was the only proper defendant of the two, since Coombe was tasked with administering and enforcing the statute at issue. *Id.* at *6. Thus, nothing in *Curtis* precludes the plaintiffs in this case from asserting a claim for injunctive relief against individual defendants who they have shown had a connection to the enforcement of the offending policy and indeed, were personally responsible for the alleged constitutional violations at issue. *See In re Dairy Mart,* 411 F.3d at 372–73; *Davidson,* 148 F.Supp.2d at 254.

Accordingly, the Court finds that injunctive relief is permissible against defendants Goord, Leonard, Nuttal, Mazzuca, and Harris.

### IV. CONCLUSION

For the foregoing reasons, State Defendants' summary judgment motions are granted in part and denied in part. Defendants' motion to dismiss plaintiff Chatin's claims for injunctive relief as moot is granted. Summary judgment in favor of defendants is granted on plaintiffs' RLUIPA claim to the extent plaintiffs seek monetary damages. Defendants' motions are denied in all other respects. The Clerk of the Court is respectfully directed to terminate the motions located at document numbers 113 and 122.

SO ORDERED.